**ARICA INSTITUTE, INC., Plaintiff,**

v.

**Helen PALMER and Harper & Row Publishers, Inc., Defendants.**

**No. 90 Civ. 5153 (RPP).**

United States District Court,
S.D. New York.

April 9, 1991.

Frankfurt, Garbus, Klein & Selz, New York City by Arthur J. Ginsburg, for plaintiff.

Schwab Goldberg Price & Dannay, New York City by Richard Dannay, for defendants.

## OPINION AND ORDER

**ROBERT P. PATTERSON, Jr., District Judge.**

Plaintiff, a non-profit educational institution, charges defendants with copyright infringement in violation of the Copyright Act of 1976, 17 U.S.C. § 101 *et seq.*, trademark infringement in violation of section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), and common law unfair competition. Plaintiff moved by order to show cause for a preliminary injunction pursuant to Rule 65 of the Federal Rules of Civil Procedure. For the reasons set forth below, plaintiff's motion is denied.

## BACKGROUND

Plaintiff Arica Institute, Inc. ("Arica") is a not-for-profit tax-exempt educational institution founded in the state of New York in 1971 by Oscar Ichazo ("Ichazo"). According to Arica's Executive Director Elliott Dunderdale ("Dunderdale"), Arica offers training for the whole human being focused on the clarification of consciousness. Tr. at 270.[1] Arica operates forty franchise training centers throughout the United States, South America, Europe and Australia which have enrolled from 1971 to present approximately 250,000 students. Tr. at 279–80.

The history of Arica dates back to April 1971 when Oscar Ichazo conducted the first Arica training in the city of Arica, Chile.[2] Ichazo, born in Bolivia in 1931 and trained in Zen, Sufism, Yoga, Buddhism, Confucianism, I Ching and the Kabbalah, taught a system that is now known within Arica as the system of "ego fixations." Tr. at 272–73, 290–291. Fifty-five people, including John Lilly ("Lilly"), Joseph Hart ("Hart") and Claudio Naranjo ("Naranjo"), attended the 1971 seminar in Chile and tape recorded Ichazo's lectures. Tr. at 274–76. Upon returning to the United States, every student except Naranjo returned his or her tapes to Arica's archives. Arica transcribed the lecture tapes and in 1973 registered them with the Copyright Office as eight separate volumes which share the title *The Lectures of Oscar Ichazo.* Pl. Exh. 15.

"Enneagons" or "enneagrams" are nine-pointed stars typically surrounded by a circle.[3] It is undisputed that enneagrams have appeared throughout history, although Elliott Dunderdale ("Dunderdale"), Executive Director of Arica since 1989, testified that no one has used the enneagram in the way Arica uses it "in terms of the process of the ego fixations as it applies to human psyche." Tr. at 369. Dunderdale testified that Arica uses enneagrams as "a map of process or a guide to process." Tr. at 292. In simplest terms, the Arica system uses a total of 108 enneagrams,[4] which Ichazo claims to have "discovered,"[5] as a "method of working with the nine parts of the body and nine parts of the human psyche," Tr. at 273, and as a method of explaining "the [ego] fixations and the ideas that cure them." *Interviews with Oscar Ichazo* (Arica Institute Press 1982) at 13.

From the student's perspective, Arica training comprises nine successive levels of dietary, physical, meditative, logical and analytical instruction which can be completed in approximately three years.[6] Tr. at 373.

---

1. References to the transcript of the evidentiary hearing held before this Court on March 15 and 18, 1991 are designated "Tr. at ___."

2. The first Arica training in the United States was held in New York City in late 1971. Tr. at 269.

3. Elliott Dunderdale, Executive Director of Arica, testified that there is no difference in terms of geometric shape between an "enneagon" and an "enneagram." Tr. at 291. Hereinafter, the Court will use the term "enneagram."

4. Tr. at 422.

5. *See* Def.Exh. Z at 71 (O. Ichazo, *Letters to the School* (Arica Institute Press 1988)). According to Ichazo:

 ... Arica is essentially a spiritual theory and system, though pragmatically established in reality by the use of trialectic logic. Pl.Exh. 14 at 89.

6. PROTOANALYSIS, the name for the third level of Arica training which focuses on enneagrams and the ego fixations, is a registered service mark. Tr. at 293.

Tuition for each training ranges in price from $75 to $750 and several training levels are offered as intensive two-week residential programs. Tr. at 370–73.

In addition to conducting training sessions, Arica publishes various training manuals, books by Ichazo, and a journal entitled *The Arican.* Over the years, Arica has obtained copyright registrations for approximately 46 of these works. Pl. Exh. 15. The copyrighted training manuals, including the "Manual of the Arica Forty Day Training" and the "Three Month Manual," are not available to the public—students are required to return the manuals to Arica at the end of the training. The student manuals, home study manuals and *The Arican* can be purchased at Arica training centers and the book *Interviews with Oscar Ichazo* is sold publicly in bookstores. Tr. at 281–82.

Defendant Helen Palmer ("Palmer") is a psychology professor who currently resides in California. According to Palmer, Claudio Naranjo, a Chilean psychologist, had a personal falling out with Ichazo after the 1971 training in Chile because Naranjo wanted to apply psychological ideas to Ichazo's material in order to "bring[ ] it into contemporary life and out of secrecy." Tr. at 183–84. Palmer testified that it was Naranjo who chose the English words associated with the points on Ichazo's enneagrams because Ichazo spoke little English when he lectured in Chile. Tr. at 201, 205.[7]

After 1971, Ichazo and Naranjo both taught enneagram theory using a method described as "intense, small group psychological growth work." Pl. Exhs. 1, 9 at xiv (C. Tart, *Preface* to H. Palmer, *The Enneagram*); Tr. at 225–28. Palmer began studying under Claudio Naranjo in 1973. Tr. at 184. However at that time, she was already familiar with enneagrams. Since 1965 Palmer had been associated with the Gurdjieff Society, an international organization named for a scholar born in 1870 in Russia named G.I. Gurdjieff. Tr. at 180. Palmer testified that the enneagram diagram "is almost synonymous with Gurdjieff." Tr. at 186. According to Palmer, Gurdjieff taught that the nine points of an enneagram represented the Seven Deadly Sins (anger, pride, envy, greed, gluttony, lust and sloth) plus two additional sins Palmer believes were classified by Ichazo as self-love and fear. Tr. at 186–87. Using the enneagram as a guide, Gurdjieff identified nine "chief features" of "temperament," Tr. at 191, or nine personality types. Palmer testified that after studying with Naranjo she concluded that Ichazo was teaching Gurdjieff-based material but claiming he "got it on his own." Tr. at 207.

Palmer began teaching enneagram theory in 1974 when she founded the Center for the Investigation and Training of Intuition ("CITI"). Tr. at 172–73. CITI is located in Berkeley, California and has a yearly enrollment of approximately 1500 students primarily from the psychological community, i.e., persons with bachelor's, master's or PhD degrees in psychology. Tr. at 173–74.

Palmer's book *The Enneagram*, published by HarperCollins in hardback in November 1988,[8] opens with the passage:

> The Enneagram is an ancient Sufi teaching that describes nine different personality types and their interrelationships. The teaching can help us to recognize our own type and how to cope with our issues; understand our work associates, lovers, family, and friends; and to appreciate the predisposition that each type has for higher human capacities such as empathy, omniscience, and love.

Pl. Exhs. 1, 9 at 3. *The Enneagram* is 392 pages long and is divided into two sections, "Orientation to the Enneagram" and "The Nine Points of the Enneagram." The book also contains a preface by Charles Tart, a short appendix and notes.

---

7. Dunderdale testified that his understanding was that Ichazo had lectured in English. Tr. at 275.

8. HarperCollins Publishers, Inc. ("HarperCollins") f/k/a Harper & Row Publishers, Inc. published approximately 55,000 copies of the hardcover edition of *The Enneagram* in November 1988. Tr. at 443. Sales to retailers and wholesalers totalled $147,500 in 1988 and $186,000 in 1989. *Id.* at 441. Approximately 3300 copies have been returned to HarperCollins unsold. *Id.* at 444.

Palmer equates Ichazo's nine "ego fixations" with nine basic personality types. Tr. at 224. Palmer credits Ichazo with correctly placing the types around the nine-pointed star "so that the relationships among the types could be verified through interviews." Pl.Exhs. 1, 9 at 47. Palmer's nine personality types are described at length in the nine central chapters of *The Enneagram* which have titles such as "Point One: The Perfectionist," "Point Two: The Giver," "Point Three: The Performer," etc.[9] Palmer testified that she chose the chapter titles from terms currently used in psychological typing. Tr. at 212–13. Each chapter contains a banner listing the main features of that particular personality type. The terms in the banners features are derived from an all-inclusive chart on page 50 of *The Enneagram* showing seven enneagrams. The text of each chapter profiles that personality type and concludes with two lists, "What helps [Ones, Twos, etc.] Thrive" and "What [Ones, Twos, etc.] Should Be Aware Of."

Palmer testified that her sources for *The Enneagram* included (1) information she learned from lectures given by Claudio Naranjo in the early 1970's;[10] (2) the Gurdjieff ideas and material with which she was already familiar;[11] (3) a chapter entitled "The Arica Training" by Hart and Lilly first published in Charles Tart's *Transpersonal Psychologies* (Harper & Row 1975);[12] (4) *Interviews with Oscar Ichazo* (Arica Institute Press 1982), a collection of interviews by journalists and members of Arica;[13] and (5) conclusions she has reached from interviews of her students since 1976.[14] Palmer has never attended an Arica training and testified that she has never inspected any Arica works deposited in the Library of Congress nor seen copies of any of plaintiff's works other than *Interviews with Oscar Ichazo*. Tr. at 237–40, 300.

On February 20, 1991, six months after the initiation of this lawsuit, HarperCollins decided to print 35,000 paperback copies of *The Enneagram* for tentative release on March 12, 1991. Tr. at 449; Pl.Exh. 30. The paperback version of *The Enneagram* is substantially identical to the hardcover version except for its soft cover. Def.Exh. DD. The paperback does, however, contain a newly-added one-page notice appearing after the preface relating to this litigation which states that neither Palmer nor HarperCollins is affiliated with Arica and that *The Enneagram* is neither endorsed nor authorized by Arica Institute or Oscar Ichazo.[15] HarperCollins shipped approximately 21,000 copies of the paperback from its central warehouse on March 11–14, 1991, primarily to fill back orders dating from September 1990. Tr. at 449–51.[16]

Lewis Gillenson, a publishing expert, testified that unlike mass paperbacks, which are sold primarily in drugstores or transit stations, trade paperbacks are more expensive and are sold in college and general bookstores. Tr. at 158. Gillenson testified that as a general rule, a trade paperback will outsell the hardcover edition of the same book by a ratio of 5:1 or 6:1. Tr. at 159. William Baker, HarperCollins' vice-president/controller responsible for book distribution in and after 1971, testified that there is a 1:1 relationship between sales of hardcovers and trade paperbacks published by HarperCollins. Tr. at 461.

---

**9.** Arica does not object to the titles of chapter six and nine, "The Devil's Advocate" and "The Boss." Tr. at 330.

**10.** Tr. at 194, 199, 219–20.

**11.** Tr. at 182.

**12.** Tr. at 198–99.

**13.** Tr. at 217.

**14.** Tr. at 223; Pl.Exhs. 1, 9 at 6, 53. Quotations from her interview subjects appear throughout *The Enneagram.*

**15.** The notice also states: "Ms. Palmer has developed theories about the use of the enneagram in understanding human personality and its relationship to aspects of higher awareness *that are different and distinct from those expounded by Mr. Ichazo.*" Pl.Exh. 9 (emphasis added).

**16.** In August 1990 HarperCollins agreed to give Arica two weeks' notice prior to release of the paperback. Pl.Exh. 7. HarperCollins rescinded that agreement by letter on February 21, 1991. Pl.Exh. 8.

Arica and HarperCollins began exchanging letters in June 1988, prior to the publication of the hardcover edition of *The Enneagram,* when attorneys for Arica were supplied with galleys and thereafter sent HarperCollins various copyright and trademark registrations and a copy of *Conversations with Oscar Ichazo.* Def.Exh. P; Tr. at 147, 316. On April 13, 1989 Arica provided HarperCollins with simple charts comparing phrases appearing in *The Enneagram* with phrases appearing in Arica's copyrighted material. Pl.Exh. 4; Tr. at 79–80; Pl.Exhs. 23–25 (full-size charts). On March 9, 1990 Arica provided Harper-Collins with 23 pages of written comparisons which substantially repeated the information contained in the charts. Pl.Exh. 5.

Arica filed its complaint in this action on August 6, 1990. On August 24, 1990 defendants served interrogatories requesting Arica to identify the specific copyrighted expression it alleges was copied (and its source) and the corresponding material in Palmer's *The Enneagram.* Arica's interrogatory answers and objections, in the form of a 388–page list of comparisons (Pl.Exh. 26) which Dunderdale claims he and his wife compiled for over four months, Tr. at 341, were not served on defendants until a March 12, 1991 hearing before this Court at which plaintiff requested a temporary restraining order to halt release of the paperback edition of *The Enneagram.* The Court denied plaintiff's request and held a preliminary injunction hearing on March 15 and 18, 1991.

## DISCUSSION

Defendants label plaintiff's attempt to halt the release of the paperback edition of *The Enneagram* as an effort to prevent "heresy" not copyright infringement.[17] The Court agrees.

Elliott Dunderdale, Executive Director of Arica, testified that Palmer's *The Enneagram:*

... created a tremendous confusion among those people who have taken Arica trainings, people who are likely to take Arica trainings and people who have taken her trainings.... [T]he only person who picks the fixation in the Arica system is still Oscar Ichazo.... [P]eople are led to believe that they can pick their own fixation arbitrarily and they do.... [T]he net effect of that is they are relegating themselves and other people to a further life of ignorance....

Tr. at 352–54. Plaintiff has not shown a likelihood of success on the merits or even sufficiently serious questions going to the merits. The analysis set forth below demonstrates (1) that neither Ichazo's system of the ego fixations nor the individual words and phrases in Arica materials pertaining to that system are copyrightable, (2) that the majority of instances cited by plaintiff as alleged copying do not exhibit substantial similarity and (3) that the few isolated instances of possible copying identified by the Court are protected by fair use. Much of what plaintiff objects to—Palmer's "misappropriation" of the "same words, same schemas, same theories as Arica"[18]—simply is not protected under the copyright laws. Moreover, Palmer has a right to present her ideas on how psychological study of human beings may be assisted using enneagram analysis regardless of whether her ideas represent the "true philosophy" of enneagram analysis.[19] Works such as *The Enneagram* which make fair use of copyrighted materials are justified because "[a] dwarf standing on the shoulders of a giant can see farther than the giant himself." Chafee, Reflections on the Law of Copyright: I, 45 Colum.L.Rev. 503, 511 (1945). It matters not that the copyright owner thinks the dwarf needs glasses.

1. Standard for Preliminary Injunctive Relief

It is well-settled in this Circuit that in order to obtain a preliminary injunction, the

---

**17.** Def.Mem. of Law in Opp. filed Mar. 14, 1991 at 12.

**18.** Pl.Exh. 14 at 88.

**19.** Tr. of hearing held Mar. 12, 1991 at 12 (plaintiff's counsel).

moving party must show (1) irreparable harm and (2) either (i) a likelihood of success on the merits or (ii) sufficiently serious questions going to the merits to make them fair ground for litigation and a balance of hardships tipping decidedly in that party's favor. *See Jackson Dairy, Inc. v. H.P. Hood & Sons,* 596 F.2d 70, 72 (2d Cir.1979).

■ Irreparable harm may ordinarily be presumed in copyright cases. *See Hasbro Bradley, Inc. v. Sparkle Toys, Inc.,* 780 F.2d 189, 192 (2d Cir.1985).[20] The Court's ruling is based on a finding that Arica has altogether failed to satisfy the second prong of the *Jackson Dairy* test, likelihood of success on the merits or sufficiently serious questions going to the merits to make them a fair ground for litigation.

### 2. Ideas and Unprotected Expression

■ The elements of a claim of copyright infringement are: (1) ownership of a valid copyright and (2) unauthorized copying by the defendant. Defendants do not dispute the ownership or validity of Arica's copyrights. Defendants do, however, maintain that much of what plaintiff claims to be infringed is unprotectible.

Section 102(b) of the Copyright Act of 1976 provides:

> In no case does copyright protection for an original work of authorship extend to any idea, procedure, process, system, method of operation, concept, principle, or discovery, regardless of the form in which it is described, explained, illustrated, or embodied in such work.

17 U.S.C. § 102(b) (1988). Copyright instead protects an author's particular expression of an idea. *See Reyher v. Children's Television Workshop,* 533 F.2d 87, 90 (2d Cir.), *cert. denied,* 429 U.S. 980, 97 S.Ct. 492, 50 L.Ed.2d 588 (1976). Courts will not find copyright infringement where the only similarity between plaintiff's and defendant's works is that of an abstract idea, system or discovery because to do so would unduly inhibit independent creation by others. *See Gund, Inc. v. Smile Intern., Inc.,* 691 F.Supp. 642, 644 (E.D.N.Y. 1988), *aff'd,* 872 F.2d 1021 (2d Cir.1989); *Merritt Forbes & Co. v. Newman Inv. Sec., Inc.,* 604 F.Supp. 943, 949 (S.D.N.Y. 1985).

■ Dunderdale admitted on cross-examination that the Arica system is equivalent to a philosophy or a program. Tr. at 435. Ichazo's ideas as expressed in the copyrighted books and manuals embody a theory of nine separate ego fixations having identifiable traits. Pl. Post–Hearing Mem. filed Mar. 26, 1991 at 22. *The Enneagram* by Helen Palmer advances a theory of nine separate personality types. Plaintiff accuses Palmer of copyright infringement because she used the same words and phrases to describe each personality type that Ichazo used to describe the ego fixations, with the added insult that "her approach is simply to leave important parts of Arica's philosophy out." Pl. Post–Hearing Mem filed Mar. 26, 1991 at 23. For example, plaintiff cites Palmer's use of the terms "inner critic," "correctness," or "worry" in the chapter entitled "Point One: The Perfectionist" as copied from Ichazo's description of the "resentment ego." Pl.Exh. 26 at 44–45, 55, 61.

The copyright laws do not confer a monopoly on Arica in the method of describing a particular and interrelated set of characteristics or traits. *See Mihalek Corp. v. State of Michigan,* 630 F.Supp. 9, 13 (E.D. Mich.1985) ("fact that both plaintiff and the creators of the state's campaign sought to extol certain features of the state cannot form the basis of an infringement action"), *aff'd,* 814 F.2d 290 (6th Cir.), *on reh'g,* 821

---

**20.** The Court notes in passing that plaintiff's 16–month delay in moving for preliminary injunctive relief after publication of *The Enneagram* in November 1988 undercuts the Court's presumption of irreparable harm. *See Gianni Cereda Fabrics, Inc. v. Bazaar Fabrics, Inc.,* 335 F.Supp. 278, 280 (S.D.N.Y.1971) (seven-month delay combined with failure to provide "particu-

lars regarding the copyright plaintiff had represented that it had"). Further, this is not a case where the presumption of irreparable harm is "bolstered" by uncontradicted testimony of direct competition between the parties. *Cf. Iris Arc v. S.S. Sarna, Inc.,* 621 F.Supp. 916, 924 (E.D.N.Y.1985). *See* Tr. at 302–03 (Dunderdale); Tr. at 174 (Palmer).

F.2d 327 (6th Cir.), *cert. denied,* 484 U.S. 986, 108 S.Ct. 503, 98 L.Ed.2d 502 (1987); *McGraw–Hill, Inc. v. Worth Publishers, Inc.,* 335 F.Supp. 415, 421 (S.D.N.Y.1971) (defendant's use of technical jargon in economics textbook did not infringe). The Court takes judicial notice of the fact that these very same terms are commonly used to describe the astrological sign of Virgo, another system of personality types in this genre.[21]

■ Plaintiff also complains that the narration of Palmer's nine personality types is structured in the same fashion as Ichazo's analysis of the ego fixations. Plaintiff cannot claim protection for the order of the points on an enneagram, e.g., clockwise starting at one o'clock. Dunderdale testified that an enneagram is recognizable because it is "a list of nine things." Tr. at 368. Palmer's description of the nine points on an enneagram in sequential order does not constitute copyright infringement because that sequence is not copyrightable. *See Hearn v. Meyer,* 664 F.Supp. 832, 851 (S.D.N.Y.1987) (thematic/chronological order not protected).[22] Protection of structure and sequence is more readily available for fact-based works. *See, e.g., Wainwright Sec., Inc. v. Wall St. Transcript Corp.,* 558 F.2d 91, 95–96 (2d Cir.1977),

*cert. denied,* 434 U.S. 1014, 98 S.Ct. 730, 54 L.Ed.2d 759 (1978).

■ Finally, plaintiff complains about Palmer's chapter titles and about scattered similarities of words and phrases. While the threshold of originality required to register a work under the Copyright Act is low, fragmentary words and phrases do not exhibit the minimal level of creativity necessary for copyright protection. *See Salinger v. Random House, Inc.,* 811 F.2d 90, 98 (2d Cir.) (cliche or ordinary word combination), *reh'g denied,* 818 F.2d 252 (2d Cir.), *cert. denied,* 484 U.S. 890, 108 S.Ct. 213, 98 L.Ed.2d 177 (1987); *Alberto–Culver Co. v. Andrea Dumon, Inc.,* 466 F.2d 705, 711 (7th Cir.1972) (advertising slogan not copyrightable); *Magic Mktg., Inc. v. Mailing Servs. of Pittsburgh, Inc.,* 634 F.Supp. 769 (W.D.Pa.1986) (envelopes describing contents with phrases such as "PRIORITY MESSAGE" or "GIFT CHECK" not copyrightable). *Cf. Regents of the University of Minnesota v. Applied Innovations, Inc.,* 685 F.Supp. 698 (D.Minn.1987) (short, declarative true/false statements protected), *aff'd,* 876 F.2d 626 (8th Cir.1989).

The Court's review of the 388–page set of comparisons reveals many instances of alleged copyright infringement falling within this rule, including the following:

| Arica | Palmer, The Enneagram |
|---|---|
| "Over-observer" (Alpha Heat Meditation manual (1976), p. 8) | "Point Two: The Observer" ((chapter title, p. 204) |
| "Nothing is good for him, he is always bad." (Lecture # 38, p. 24) | "In an intimate relationship, this can come out as repressing anger as a bad emotion. . . ." (in "Point One: The Perfectionist," p. 87) |

---

**21.** *See* C. Golder, *Love Lives: Using Astrology to Build the Perfect Relationship with Any Star Sign* at 66, 69, 192 (1989) ("critical," "do everything right," "worry").

**22.** Again the analogy is to astrology—books describing the astrological signs are commonly structured in order of the birth months for each sign.

*Meredith Corp. v. Harper & Row, Publishers, Inc.,* 378 F.Supp. 686, 690 (S.D.N.Y.), *aff'd per curiam,* 500 F.2d 1221 (2d Cir.1974), is not controlling because in that case the Court based its finding of "extensive taking of the entire structure and topical sequence" of plaintiff's psychology text on unrebutted evidence of actual copying.

"1. crave security
2. crave prestige"
(Doors of Compensation Manual, addendum)
"Virility/Femininity: this is the way the ego feels its sexuality. If it feels masculine or feminine, it will feel this point very well covered."
(in "Enneagram of Syntony," Three Month Manual, p. 141)
"This ego is tremendously preoccupied with what others think about him. He defends his image more than anything else."
(The Human Process for Enlightenment and Freedom, p. 54)

"For example, all Threes will focus a lot of attention on security, prestige, and masculine/feminine image...."
(in "Contributors to the System," p. 49, 51)

---

Tr. at 330, 346, 392–95; Pl.Mem. dated Mar. 11, 1991 at 13. With respect to these types of passages, plaintiff cannot demonstrate that what was allegedly copied constitutes protected expression.

### 3. Copying of Expression

▮ Plaintiffs in copyright infringement actions are permitted to prove the second element of their claim—unauthorized copying by the defendant—indirectly by demonstrating access and substantial similarity. 3 M. Nimmer & D. Nimmer, *Nimmer on Copyright* § 13.01[B] (1990). Access may be inferred when the defendant has had a "reasonable opportunity to view" plaintiff's work before creating his own. *See Gaste v. Kaiserman*, 863 F.2d 1061, 1067 (2d Cir.1988). There is substantial similarity when "the ordinary observer, unless he set out to detect the disparities, would be disposed to overlook them, and regard [the] aesthetic appeal [of the two works] as the same." *Peter Pan Fabrics, Inc. v. Martin Weiner Corp.*, 274 F.2d 487, 489 (2d Cir.1960). In cases where the trier of fact finds the parties' works not merely substantially similar but strikingly similar,

copying may be proved without proof of access. *See Gaste*, 863 F.2d at 1067; *Arnstein v. Porter*, 154 F.2d 464, 468 (2d Cir. 1946).

#### a. *Striking Similarity*

▮ The evidence in this action shows that the only copyrighted work which Palmer actually saw prior to writing *The Enneagram* was *Interviews with Oscar Ichazo*. Since Arica cannot show access for the majority of its copyrighted works,[23] Arica relies on the doctrine of striking similarity, arguing that expression in the Arica materials and in *The Enneagram* is so strikingly similar that there can be no conclusion but that Palmer copied from Arica. Pl.Mem. dated Mar. 11, 1991 at 6.

As an example of striking similarity, Arica points to the words or labels (such as "resentment," "fear," "courage" and "me first") appearing around each of the seven enneagrams printed on page 50 of *The Enneagram*. Arica argues that these labels match the labels in the Ichazo's enneagrams used to describe the particular ego

---

**23.** Palmer testified that Naranjo did not distribute any written materials or class handouts. Tr. at 199. Dunderdale had no knowledge that Palmer saw any Arica material. *Id.* at 413. To the extent Naranjo "showed" Palmer any of Ichazo's material, he did so by reproducing it in a new form, such as by writing terms on the blackboard. *Id.* at 199. While evidence that a third party with whom both plaintiff and defendant were dealing had possession of plaintiff's work is sufficient to establish access, *see* 3 M. Nimmer & D. Nimmer, *Nimmer on Copyright* § 13.02[A] at 13–13 (1990), there is no evidence that Palmer had any opportunity to listen to Naranjo's tape recording of Ichazo's Chile lectures or that Naranjo possessed any of the 46 other copyrighted works.

fixations. Pl.Exh. 5. Assuming for argument's sake only that the individual labels are copyrightable, there is ample evidence to rebut any inference of copying.

An acknowledgment beneath Palmer's chart at page 50 reads:

Adapted from *Transpersonal Psychologies*, Edit. Charles Tart, Harper & Row, 1975. Reprinted by Psychological Processes, Inc. 1983, Charles Tart.

Pl.Exhs. 1, 9 at 50; Tr. at 213.[24] The evidence indicates that any similarity between Palmer's labels and Ichazo's labels stems from one of two sources: (1) Palmer's selection of a common synonym from among a limited number of synonymous

words (e.g., substituting "veracity (honesty)" for Tart's label "Truthfulness"); or (2) the fact that Palmer learned Ichazo's enneagram terminology from Naranjo (e.g., "castle"). Accordingly, plaintiff has not established a likelihood of success on the issue of whether the chart on page 50 of *The Enneagram* constitutes copyright infringement.

### b. *Substantial Similarity*

A review of the 388–page set of comparisons shows that the majority of instances of alleged infringement bear no relation whatsoever to copyrighted expression. The following are some examples:

| Arica | Palmer, The Enneagram |
|---|---|
| "... obsession for rigid positions ..." (in "Over–Perfectionist," Protoanalysis Manual, p. 38) | "... as if an old grudge never quite goes away with time." (in "Point One: The Perfectionist," p. 87) |
| "The hero is the work.... They do trust in their capacity. There is a demi–God attitude that they'll put over their part." (Three Month Manual p. 156) | "... the supermom who gets the job done ..." (in "Point Three: The Performer," p. 135) |
| "SUPERIORITY —Feeling of being destined for great works." (Protoanalysis Manual p. 5) | "There is ... a tendency to look down on those who have a 'lesser vision.'" (in "Point Seven: The Epicure," p. 287) |

---

Tr. at 396; Pl.Exh. 26 at 114, 293. In some passages the only similarity is of an abstract idea. Other passages are not similar because Palmer expresses a different idea in a different way. *See Hearn v. Meyer*, 664 F.Supp. 832, 849 (S.D.N.Y.1987). For either type of passage, plaintiff has failed

to demonstrate a likelihood of success on or serious questions going to the issue of substantial similarity.

Plaintiff propounds other examples as instances where Palmer closely paraphrased copyrighted expression or copied parts of it verbatim:

24. The seven enneagrams pictured on page 50 can be found at pages 333, 335, 338 and 347–49 of the Hart and Lilly article in Tart's book. Out of 63 total labels, in five cases Palmer substituted her own word in place of a different word in Tart (for example, "dauntless" for Tart's "Defensive action"). In four other cases Palmer added a second synonymous term in parentheses to the label used by Tart (for example, "avarice/greed" for Tart's "avarice"). Plaintiff's claim that Palmer copied the material appearing on page 50 from Arica is not substantiated in the remaining 54 of 63 instances.

| Arica | Palmer, <u>The Enneagram</u> |
|---|---|
| "In essence . . .; there is no conflict within the person between head, heart, and stomach. . . ." <br> (Interviews with Oscar Ichazo p. 9) | "In essence we are like young children: there is no conflict between our thoughts, our emotions, or our instincts." <br> (in "Background of the System," p. 18) |
| "A contradiction develops between the inner feelings of the child and the outer social reality to which he must conform." <br> (<u>Id</u>. p. 9) | "A contradiction developed between the child's central trust of the environment and the family reality, which must be obeyed." <br> (<u>Id</u>. p. 19) |
| "Personality forms a defensive layer over the essence. . . ." <br> (<u>Id</u>.) | "From the point of view of a psychology that includes a concept of essence, <u>personality develops in order to protect and defend essence from injury in the material world."</u> <br> (same, p. 19–20) |
| "HUMILITY: The acceptance of the limits of the body's capacities." <br> "SOBRIETY: . . . The body lives in the moment, taking in no more and no less than is needed. . . ." <br> (Forty Day Manual p. 99) | "Humility is the recognition of one's exact needs and the natural inclination to take no more and no less than what is necessary." <br> (in "Point Two: The Giver," p. 129) |

---

Tr. at 344–45; Pl.Mem. dated Mar. 11, 1991 at 12–13.

 Extensive paraphrasing plainly constitutes copyright infringement. *See Salinger v. Random House, Inc.*, 811 F.2d 90, 97 (2d Cir.1987), *reh'g denied*, 818 F.2d 252 (2d Cir.), *cert. denied*, 484 U.S. 890, 108 S.Ct. 213, 98 L.Ed.2d 177 (1987). The similarities shown in the first three examples, while insignificant in relation to the 388-page of comparisons, are material because Palmer admits having *Interviews with Oscar Ichazo* in her possession prior to writing *The Enneagram*. Subconscious copying stemming from having read the copyrighted work at some time in the past is equally as actionable under the copyright laws as intentional copying. *See ABKCO Music, Inc. v. Harrisongs Music, Ltd.*, 722 F.2d 988, 998 (2d Cir.1983); *Herbert Rosenthal Jewelry Corp. v. Kalpakian*, 446 F.2d 738, 741 (9th Cir.1971). However, the defense of fair use shields Palmer from liability for these isolated instances of copying.

### 4. Fair Use

 Section 107 of the Copyright Act of 1976 provides:

Notwithstanding the provisions of section 106, the fair use of a copyrighted work, . . . for purposes such as criticism, comment, news reporting, teaching (including multiple copies for classroom use), scholarship, or research, is not an infringement of copyright. In determining whether the use made of a work in any particular case is a fair use the factors to be considered shall include—

(1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes;

(2) the nature of the copyrighted work;

(3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and

(4) the effect of the use upon the potential market for or value of the copyrighted work.

17 U.S.C. § 107 (1988).

Of the four non-exclusive factors listed in § 107, only the second—the nature of the copyrighted work—favors plaintiff. Because the great majority of Arica's manuals and lectures, even though they date

back to the early 1970's, are unpublished, they are entitled to greater copyright protection than published works. *See Harper & Row Publishers, Inc. v. Nation Enter.*, 471 U.S. 539, 564, 105 S.Ct. 2218, 2232, 85 L.Ed.2d 588 (1985). The remaining fair use factors, viewed in the factual context of this case, are dispositive in favor of Palmer.

If a book falls into one of the categories listed in the preamble to section 107, assessment of the first fair use factor—the purpose and character of the use—should be at an end. *See New Era Publications Int'l, ApS v. Carol Publishing Group*, 904 F.2d 152, 156 (2d Cir.1990), *cert. denied*, —— U.S. ——, 111 S.Ct. 297, 112 L.Ed.2d 251 (1990). Dunderdale admitted that Palmer's book is "an informational exposition on the material." Tr. at 356. Although *The Enneagram* is sold for profit, Palmer's book undeniably constitutes a combination of comment, criticism, scholarship and research, all of which enjoy favored status under § 107. *See Maxtone-Graham v. Burtchaell*, 803 F.2d 1253, 1260–62 (2d Cir.1986), *cert. denied*, 481 U.S. 1059, 107 S.Ct. 2201, 95 L.Ed.2d 856 (1987).[25] Palmer recites the history of enneagram theory and its principal proponents, acknowledging Ichazo's contributions to the theory, explains how the diagram is used in her view and extols the virtues of applying contemporary psychological theory to enneagram theory in order to make the theory more than a method for "a mystical path of transformation." Pl. Exhs. 1, 9 at 51. It is totally invalid for plaintiff to claim as it does that when Palmer writes at page 46, "Ichazo named the higher mental quality the Holy Idea and the higher emotional quality the Virtue," she infringes the terms "The Virtues" and "Holy Ideas" which appear in plaintiff's manuals. Pl.Exh. 26 at 23. The first fair use factor—the purpose and character of the use—favors Palmer.

The third fair use factor—the amount and substantiality used—favors Palmer as well. Most if not all of the alleged infringements constitute cliches or ordinary word combinations. Giving plaintiff a generous reading, the other alleged infringements constitute at most close paraphrasing and are found in Palmer's chapter entitled "Background of the System." The corresponding copyrighted expression constitutes only a minor quantity in relation to the 46 copyrighted works as a whole, which fill two cardboard file boxes. Given that plaintiff's copyrighted materials span a range of topics, a conclusion that in these isolated passages Palmer has appropriated the qualitative "heart" of the copyrighted works would be more than inappropriate. *Cf. Harper & Row*, 471 U.S. at 564–65, 105 S.Ct. at 2232–33.

Applying the fourth factor—impairment of value of or market for the copyrighted works—which the Supreme Court has deemed the single most important element of fair use, *Harper & Row*, 471 U.S. at 566, 105 S.Ct. at 2233, the Court concludes that publication of a paperback edition of *The Enneagram* will not impair either the value of or the potential market for Arica materials. Since only one of plaintiff's works is sold to the general public in bookstores, the actual and potential market for Arica's works comprises Arica members or persons enrolling in Arica training programs. Thus it is reasonable to use Arica's student enrollment, which began to decline in 1984–85, as a yardstick for potential harm. Elliott Dunderdale attributed this decline to the distribution of Palmer's class notes, Tr. at 304–05, 381, which occurred several years prior to first publication of *The Enneagram* in 1988. Tr. at 381. The decline was also simultaneous with distribution of a paperback edition of Tart's *Transpersonal Psychologies*, containing a chapter on Arica by Hart and Lilly, which had been published in 1983. Finally, publication of Palmer's paperback is merely an extension of any impairment which may have resulted from publication

25. *See also New Era Publications Int'l, ApS v. Henry Holt & Co.*, 695 F.Supp. 1493, 1507 (S.D. N.Y.1988) (legitimate works of criticism do not lose fair use protection simply because author has profit-making objective), *aff'd*, 873 F.2d 576 (2d Cir.), *reh'g denied*, 884 F.2d 659 (2d Cir. 1989), *cert. denied*, —— U.S. ——, 110 S.Ct. 1168, 107 L.Ed.2d 1071 (1990).

**1068**

of the hardcover in 1988, for which plaintiff took no legal action. Plaintiff's evidence that trade paperbacks generally reach a wider audience than hardcovers was rebutted by the testimony of William Baker regarding specific sales patterns of Harper-Collins books.

For these reasons, plaintiff's motion for a preliminary injunction is denied. All counsel are to attend a pretrial conference on Thursday, May 2, 1991 at 9:00 a.m. in courtroom 302.

IT IS SO ORDERED.