**MONSTER COMMUNICATIONS, INC., Plaintiff,**

v.

**TURNER BROADCASTING SYSTEM, INC., et al., Defendants.**

**No. 96 Civ. 6645(LAK).**

United States District Court, S.D. New York.

Sept. 3, 1996.

Jerome R. Halperin, Kenneth D. Freundlich, Levy & Freundlich, L.L.P., New York City, for Plaintiff.

Sanford M. Goldman, Tom J. Ferber, Pryor, Cashman, Sherman & Flynn, New York City, for Defendants Turner Broadcasting System, Inc. and Turner Network Television.

## MEMORANDUM OPINION

KAPLAN, District Judge.

For two decades, Muhammed Ali, born Cassius Clay, was the dominant public figure in the world of boxing as an Olympic gold medalist, professional contender, and heavyweight champion of the world three times. He was also an arresting personality and a controversial figure whose flamboyance, adherence to the Nation of Islam, conviction for draft evasion despite a claim of conscientious objector status, and ultimate vindication on the draft charge by a unanimous Supreme Court [1] frequently made him a focus of public attention. It therefore is far from surprising that his life has become a subject of intense interest to film makers, the circumstances that gives rise to this case.

Plaintiff Monster Communications, Inc. ("Monster") made and owns an 84 minute motion picture called "When We Were Kings" ("Kings") which is scheduled for world theatrical release in October 1996. The film is an account of the 1974 heavyweight title fight between Ali and George Foreman that was held in Zaire and referred to by Ali and others as the "rumble in the jungle." It is a serious film, and it recently won a grand jury award at the Sundance Film Festival. Monster believes that "Kings" has a substantial chance of achieving great commercial and critical success.

The cloud on the horizon, from Monster's point of view, is a documentary called "Ali—The Whole Story" ("Story"), which is scheduled to premiere on Turner Network Television on Tuesday, September 3, 1996. Monster claims that Story infringes its copyright in film footage contained in Kings because Story contains a number of film clips, aggregating approximately between 41 seconds and two minutes, that appear in Kings and allegedly are owned by Monster.

On Friday, August 30, 1996, Monster brought this action against Turner and MA Projects ("MA"), said to be the licensor to Turner of certain footage used in Story, for copyright infringement. It sought a temporary restraining order and preliminary injunction restraining Turner from exhibiting or distributing any of the Zaire footage allegedly owned by plaintiff, relief which would preclude the broadcast of Story in its present form. The Court heard argument on the afternoon of August 30, 1996, at which time the parties agreed that the application for a temporary restraining order would be treated by the Court as the motion for a preliminary injunction. An evidentiary hearing was held on September 1, 1996 at which time the Court rendered a bench decision denying the motion but reserved the right to amplify and edit its remarks. This memorandum contains the Court's findings of fact and conclusions of law on the motion for a preliminary injunction thus edited and amended.

### Discussion

In order to obtain a preliminary injunction, the movant must show "(a) irreparable harm and (b) either (1) likelihood of success on the merits or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary relief." *Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc.,* 596 F.2d 70, 72 (2d Cir.1979).

### Irreparable Injury

■ The requirement of threatened irreparable harm is readily satisfied in this case. Infringement of a copyright is presumed to give rise to such harm. *Fisher–Price, Inc. v. Well–Made Toy Mfg. Corp.,* 25 F.3d 119, 124 (2d Cir.1994). Moreover, if defendants are threatening to infringe copyrighted material owned by the plaintiff, the extent of the harm to the plaintiff could not readily be measured, a factor that traditionally constitutes irreparable harm.

1. *Clay v. United States,* 403 U.S. 698, 91 S.Ct. 2068, 29 L.Ed.2d 810 (1971).

■ Turner argues that Monster has delayed unduly in bringing this action and that its delay requires the conclusion that there is no threat of irreparable injury. While the precise effect of undue delay in seeking injunctive relief is not entirely clear,[2] there is no need to determine that point here. The Court finds that Monster was not guilty of undue delay.

It appears that Monster has been aware of Turner's planned documentary, and of its possible use of footage claimed by Monster, since June. Despite several efforts, however, Monster was unable to obtain a copy of Turner's film until some time after August 22, 1996.[3] Indeed, as late as last week, an attorney for MA advised Monster that none of Monster's footage was in the Turner film. (Freundlich Aff. ¶ 7) Monster acted promptly after learning that Turner had screened Story for the media on August 27, 1996. There was no undue delay.

Turner's delay argument turns on the fact that counsel for MA on July 8 offered to allow a representative of Monster to view the Turner film in MA's office on the condition that "[d]uring the viewing, [the] representative will be required to identify, by time code, any footage which you claim to be owned or copyright by Monster." (Def.Mem.Ex. B, at 2) Monster did not avail itself of this offer.

Had Monster been offered a realistic opportunity to compare the Turner film with the footage in which it claims copyright, there might be substance to Turner's delay argument. But the opportunity offered was not realistic. Kings is 84 minutes long, and Monster claims copyright, in addition, in several hundred hours of film relating to the Zaire fight. Story is 94 minutes long. Having viewed Kings and Story consecutively, the Court finds that it would be extraordinarily difficult, given the enormous number of film clips constituting each movie, to identify with precision, under the conditions proposed by MA, each clip in Story that appears also in Kings. It would be virtually impossible in such circumstances to identify each clip in Story which appears also in several hundred hours of other film claimed by plaintiff. What plaintiff realistically required was an opportunity to view repeatedly and compare all of the film in question. Whether intended as such or not, the limited opportunity offered by MA was conditioned sufficiently to justify Monster in treating it as a set up. Monster's declination of the offer, in circumstances in which it continually demanded a copy of the Turner film for study, did not constitute unreasonable delay.

*Likelihood of Success*

Once Monster obtained a copy of Story last week, the dispute became more focused. At the commencement of this action, plaintiff claimed that there were twenty film clips in Story totaling two to three minutes in length that appear also in Kings. During the hearing on September 1, plaintiff indicated that it would not press this motion, although reserving its rights to seek other relief, with respect to three of the twenty clips.[4] Turner edited three of the allegedly infringing clips out of Story before the hearing. It contends that four of the remaining fourteen allegedly infringing clips, which aggregate 16 seconds in Story, are not the same as plaintiff's footage in Kings and must have been taken by another photographer.[5] It concedes that

---

2. See generally Bear U.S.A., Inc. v. A.J. Sheepskin & Leather Outerwear, Inc., 909 F.Supp. 896, 909–10 (S.D.N.Y.1995) (citing cases).

3. Turner concedes that it rejected such a request on principle in June 1996 and that its film was not then completed in any event. (Ringler Decl. ¶ 3)

4. The three clips in question do not appear in Kings, but appear in other footage in which plaintiff claims copyright. Plaintiff did not press the motion as to these clips because it was unable to produce, on the expedited schedule on which the motion was heard, a certificate of registration of copyright covering those clips.

5. The Court viewed the four disputed clips at the hearing. The limitations of the format in and the equipment by which they were presented did not permit, in the available time, a determination as to whether these four clips are identical to footage that appears in Kings. Turner contends also that one of the clips plaintiff says appears in Story in fact is not there. As the clip is extremely short, a determination would have required a more detailed examination of Story than time permitted. As will appear, the uncertainties as to the disputed clips are not material to disposition of the motion.

nine of the clips appear both in Kings and Story and that their aggregate duration in Story is 41 seconds. In consequence, it is clear for purposes of this motion that the Turner film contains between nine and fourteen clips that appear also in Kings and which aggregate a minimum of 41 seconds and perhaps as much as two minutes, although it seems likely that the aggregate duration is more like one minute.

Turner argues that Monster is unlikely to prevail for three reasons: (1) Monster has failed to present a copyright registration in the allegedly infringed film footage, which Turner argues is an absolute prerequisite to a suit for infringement; (2) the registration for Kings extends only to that film and not to the underlying footage; and (3) Story's use of the disputed footage is a fair use and *de minimis*.

Turner's first two points are interrelated. Section 411 of the Copyright Act of 1976, 17 U.S.C. § 411, provides, with exceptions not relevant here, that "no action for infringement of the copyright in any work shall be instituted until registration of the copyright claim has been made in accordance with this title." The only registration tendered by Monster is for Kings. Kings, Turner assumes, is a derivative work the copyright registration of which "extends only to the material contributed by the author of the work, as distinguished from the preexisting material employed in the work, and does not imply any exclusive right in the preexisting material." 17 U.S.C. § 103(b). Turner maintains that Monster has failed to establish its ownership of a registered copyright in the preexisting material—the film footage used to make Kings—as distinguished from a copyright in Kings itself. Since the claim of infringement relates to the footage and not to the movie Kings, as a whole, Turner maintains that Monster has failed to satisfy a jurisdictional prerequisite to maintenance of this action. But it is not clear that Turner's argument is correct.

For one thing, at least one circuit appears to have held that registration is a prerequisite to a suit for statutory damages under the Copyright Act, but not to a suit for injunctive relief. *Olan Mills, Inc. v. Linn Photo Co.,* 23 F.3d 1345, 1348–49 (8th Cir.1994). *But see Novak v. National Broadcasting Co., Inc.,* 716 F.Supp. 745, 750 (S.D.N.Y.1989); *Conan Properties, Inc. v. Mattel, Inc.,* 601 F.Supp. 1179, 1182 (S.D.N.Y.1984). For another, there is authority in this district holding that the registration of "a collective work satisfies the requirements of Section 411(a) for purposes of bringing an action for infringement of any of the constituent parts." *Woods v. Universal City Studios, Inc.,* 920 F.Supp. 62, 64 (S.D.N.Y.1996). Kings consists in significant part of 1974 footage shot in Zaire interspersed with footage of personalities such as Norman Mailer and George Plimpton commenting on Ali or the Zaire fight. Some of the 1974 footage appears to be accompanied by sound recorded at the time and place where the film was shot. Some have voice-overs or other sound that was recorded much more recently. Whether Kings is properly characterized as a collective rather than a derivative work, whether *Woods* correctly states the law and, if so, whether, if Kings is a derivative work, *Woods* ought to extend to derivative works all are interesting questions. In view of the Court's disposition of the fair use issue and of the balance of hardships, however, they need not be decided in order to dispose of this motion.

■ Section 107 of the Copyright Act, 17 U.S.C. § 107, codifies the defense of fair use. One may use and reproduce a copyrighted work "for purposes such as criticism, comment, news reporting, teaching ..., scholarship, or research" provided the use is a fair one. The factors to be considered in determining the fairness of the use include "(1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes; (2) the nature of the copyrighted work; (3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and (4) the effect of the use upon the potential market for or value of the copyrighted work." *Id.*

The allegedly infringing work, Story, is a biography. While it is commercial in nature, it "undeniably constitutes a combination of comment, criticism, scholarship and research, all of which enjoy favored status under

§ 107." *Arica Institute, Inc. v. Palmer*, 761 F.Supp. 1056, 1067 (S.D.N.Y.1991), *aff'd*, 970 F.2d 1067 (2d Cir.1992). As Turner argues, there can be little doubt that Ali is a figure of legitimate public concern and that his television biography is a subject of public interest. Hence, the first of the fair use factors cuts in favor of Turner although, as the Nimmers point out, it does not "necessitate a finding of fair use." 3 MELVILLE B. NIMMER & DAVID NIMMER, NIMMER ON COPYRIGHT ("NIMMER") § 13.05[A][1][a], at 13–161 to 162 (1995); *see also New Era Publications International, ApS v. Henry Holt & Co., Inc.*, 873 F.2d 576, 583 (2d Cir.1989), *cert. denied*, 493 U.S. 1094, 110 S.Ct. 1168, 107 L.Ed.2d 1071 (1990); *Rosemont Enterprises, Inc. v. Random House, Inc.*, 366 F.2d 303, 307 (2d Cir.1966), *cert. denied*, 385 U.S. 1009, 87 S.Ct. 714, 17 L.Ed.2d 546 (1967).

The second of the factors, the nature of the copyrighted work, focuses on the degree of creativity of the copyrighted work. "[T]he more creative the primary work, the more protection it should be accorded from copying." *Amsinck v. Columbia Pictures Industries, Inc.*, 862 F.Supp. 1044, 1050 (S.D.N.Y. 1994). *Accord*, 3 NIMMER § 13.05[A][2][a], at 13–174 to 175. Here there is no doubt in the Court's mind that plaintiff's film, Kings, is a creative and notable work. But defendants are not alleged to be infringing Kings. Rather, the claim is that Story uses certain film clips—photographic images—of actual historical events that appear also in Kings.[6]

Anyone who has seen any of the great pieces of photojournalism—for example, Alfred Eisenstadt's classic image of a thrilled sailor exuberantly kissing a woman in Times Square on V–J Day and the stirring photo-graph of U.S. Marines raising the American flag atop Mount Surabachi on Iwo Jima—or, perhaps in some eyes, more artistic, but nevertheless representational, photography—such as Ansel Adams' work and the portraits of Yousuf Karsh[7]—must acknowledge that photographic images of actual people, places and events may be as creative and deserving of protection as purely fanciful creations. Nevertheless, history has its demands. There is a public interest in receiving information concerning the world in which we live. The more newsworthy the person or event depicted, the greater the concern that too narrow a view of the fair use defense will deprive the public of significant information. Moreover, only a finite number of photographers capture images of a given historical event. Hence, without denying for a moment the creativity inherent in the film clips of actual events relating to the Zaire fight, the degree of protection that properly may be afforded to them must take into account that too narrow a view of the fair use defense could materially undermine the ability of other Ali biographers to tell, in motion picture or perhaps still photographic form, an important part of his story. *See, e.g., Rosemont Enterprises, Inc.*, 366 F.2d at 307. This of course is not to say that historical film footage loses all copyright protection,[8] only that its character as historical film footage may strengthen somewhat the hand of a fair use defendant as compared with an alleged infringer of a fanciful work or a work presented in a medium that offers a greater variety of forms of expression.

Here, the footage in question, although historical, does not remotely approach the Second Circuit's paradigmatic example of an

---

**6.** The footage is not of the fight itself. It includes shots of Ali and Foreman training, arriving in Zaire, of Ali walking with his wife, and other such events.

**7.** *E.g.*, portrait of Sir Winston Churchill in YOUSUF KARSH, FACES OF OUR TIME 37 (1971).

**8.** While the Second Circuit has "acknowledged in passing the conceivable occurrence of some 'rare,' 'almost unique' circumstance, such as those surrounding the Zapruder film [of President Kennedy's assassination], in which 'it is at least arguable that the informational value of [the] film cannot be separated from the photogra-pher's expression, ... thereby indicating that both should be in the public domain,' *Iowa State University Research Foundation, Inc. v. American Broadcasting Cos., Inc.*, 621 F.2d 57, 61 n. 6 (2d Cir.1980), [it has] also stated the general rule that '[c]onflicts between interests protected by the first amendment and the copyright laws thus far have been resolved by application of the fair use doctrine,' *Wainwright Securities, Inc. v. Wall Street Transcript Corp.*, [558 F.2d 91,] 95 [2d Cir.1977]." *Roy Export Co. Establishment of Vaduz, Liechtenstein v. Columbia Broadcasting System, Inc.*, 672 F.2d 1095, 1100 (2d Cir.), *cert. denied*, 459 U.S. 826, 103 S.Ct. 60, 74 L.Ed.2d 63 (1982).

image the informational content of which would weigh heaviest in favor of an alleged infringer, the Zapruder film of the Kennedy assassination. *See Roy Export Company,* 672 F.2d at 1099. Moreover, having viewed both films, the Court finds that Story would not have been diminished in any material way had it not included the allegedly infringing footage. On the other hand, the level of creativity inherent in this footage, as distinguished from the use made of the footage in Kings, appears not to be especially substantial. All things considered, the second of the fair use factors is essentially neutral.

The third of the fair use factors is the amount and substantiality of the portion used, a factor that cuts very heavily in favor of Turner for several reasons.

The first is that Kings is 84 minutes in length; Story is 94. The allegedly infringing portions of Story consist of nine to fourteen film clips aggregating a minimum of 41 seconds and a maximum of one to two minutes, which is 0.7 to 2.1 percent of the film. A number of the allegedly infringing clips are less than three seconds long. From any quantitative standpoint, the allegedly infringing use is small.

Second, the allegedly infringing footage is by no means the focus of Story. Indeed, the two movies are quite different. Kings is devoted almost entirely to the Zaire fight. It touches only fleetingly on the rest of Ali's life and career. It focuses heavily on the fact that the Zaire fight involved two African–American fighters traveling to fight in Africa, the continent of their ancestors' origin, and the impact of that experience on them and on Zaire. Story, on the other hand, is a biography of Ali from childhood to the present. It is, as its title promises, "Muhammed Ali— The Whole Story." The segment concerning the Zaire fight occupies approximately nine of its 94 minutes. It is a very different work.

Third, the Court viewed both movies within a short span of hours, Kings first and then Story, for the purpose of attempting to detect in Story, without prompting, whether and to what extent it employed footage used in Kings. Although there were a couple of occasions on which such uses were apparent, they were far fewer than the seventeen that plaintiff claims exist. That of course is not to say that the parties are mistaken. Rather, the conclusion that flows is that the allegedly infringing uses are not particularly noticeable even if one is looking for them.

For all of these reasons, the Court finds that the "amount and substantiality" factor strongly favors the defendants. *Harper & Row Publishers, Inc. v. Nation Enterprises,* 471 U.S. 539, 105 S.Ct. 2218, 85 L.Ed.2d 588 (1985), is not to the contrary. While the Supreme Court there concluded that the use of only 300 of 200,000 words of the memoirs of former President Ford was a substantial appropriation, it did so on the basis of the trial court's finding that the alleged infringer "took what was essentially the heart of the book." *Id.* at 564–65, 105 S.Ct. at 2233 (quoting 557 F.Supp. 1067, 1072 (S.D.N.Y. 1983)). The material at issue here has no remotely comparable significance in Kings.

The final fair use factor, the effect of the infringing use on the market for the original copyrighted work, is the most important. *Harper & Row Publishers, Inc.,* 471 U.S. at 566, 105 S.Ct. at 2233. In considering it, however, it is critical to bear in mind that the only effect of which plaintiff properly may complain is that caused by the alleged infringement. *New Era Publications International, ApS v. Henry Holt & Co., Inc.,* 695 F.Supp. 1493, 1522–23 (S.D.N.Y.1988), *aff'd on other grounds,* 873 F.2d 576 (2d Cir.1989), *cert. denied,* 493 U.S. 1094, 110 S.Ct. 1168, 107 L.Ed.2d 1071 (1990); 3 NIMMER § 13.05[A][4], at 13–187 to 188. In other words, the issue here is not whether the wide dissemination of Turner's television biography of Ali only weeks before the theatrical release of Monster's film will undercut the market for Kings. It is whether the use in Turner's film of up to fourteen clips of historical footage, aggregating between 41 seconds and two minutes, will undercut the market for Kings. Having viewed both movies, the Court concludes that the segments in Story are unlikely to have any such effect. The uses in Story are too few, too short, and too small in relation to the whole. If the broadcast of Story impacts Kings' reception, it almost surely will be as a result of their common subject, not their minute or so of

common footage. As the *New Era* court wrote in a case involving two written biographies of L. Ron Hubbard:

> "[T]here may be purchasers who are sufficiently interested in Hubbard to purchase one book about him but not two. [Defendant's book] may have an adverse impact on the marketability of Hubbard's [autobiography] with those purchasers simply by exhausting their interest. *That is not within the concern of the copyright statute.*" *Id.* at 1523 (emphasis supplied).

Plaintiff claimed also, for the first time at the hearing, that it is in the process of using certain of the clips allegedly infringed by Turner in two music videos currently in production and that the exhibition of those clips by Turner will undercut the market for the videos. Even assuming *arguendo* that plaintiff has protectible rights in the film clips notwithstanding the lack of a certificate of registration for them, the evidence presented concerning possible injury to the prospects for the videos was entirely speculative. The Court has no proper basis for concluding that those prospects are likely to be injured in any way. Indeed, given the importance of the music to the success of music videos and the fleeting use by Story of the allegedly infringing clips, the Court finds for purposes of the motion that Story is unlikely to have any effect on the prospects for the music videos.

*Iowa State University Research Foundation, Inc. v. American Broadcasting Companies, Inc.*, 621 F.2d 57 (2d Cir.1980), which has not been cited by the parties, warrants brief mention because it bears some resemblance to this case, although it does not support a different result. In that case, ABC used approximately eight percent of the footage from a copyrighted film biography of an Olympic wrestler as part of a vignette on the life of the athlete in its coverage of the Olympics. The Second Circuit held that the fair use defense was properly rejected. In doing so, however, it relied heavily upon the facts that ABC had exclusive television rights to broadcast the Olympic games, obtained plaintiff's film to assess its value for possible purchase, and then simply took what it desired without plaintiff's consent. In view of the exclusivity of ABC's broadcast rights, its actions deprived the plaintiff of "an extremely significant market" for its work. *Id.* at 62. Moreover, the unfairness of its conduct was found relevant to the availability of the equitable defense of fair use. The circumstances of this case are quite different.

Thus, although the record is not as complete as it might be, given the very expedited character of these proceedings, the balance of the statutory fair use factors appear to cut heavily in favor of the defendants. Accordingly, the Court concludes that plaintiff is unlikely to prevail on the merits, even assuming that it has protectible rights in the footage in question, because the defendants are likely to establish that their use is a fair one within the meaning of the Copyright Act.

*The Equities*

■ Assuming *arguendo* that plaintiff had demonstrated a sufficient prospect of success to satisfy the "fair ground for litigation" branch of the *Jackson Dairy* standard, which it has not, the Court nevertheless would deny a preliminary injunction. Were the "fair ground for litigation" test satisfied, plaintiff would be entitled to relief only if it has demonstrated that the balance of the equities tips decidedly in its favor.

Plaintiff's principal claim of harm is that the broadcast of the Turner movie will expose its footage to the public and thereby undercut the market for its own film. For the reasons expressed above, the Court does not believe that the exposure of the allegedly infringing footage—as distinguished from the exhibition by Turner of a biography of Ali, with or without that footage—will have any meaningful effect on the market for Kings.

At the hearing, plaintiff implied that the exhibition of Story could interfere with its distribution deal with Polygram. According to Mr. Sonenberg, one of plaintiff's principals, plaintiff has a "firm deal memo" with Polygram for distribution of Kings that calls for Polygram to pay plaintiff advances totaling $4.5 million, advances that have not yet been paid. He expressed the hope that Turner's broadcast would not interfere with the deal.

The exact status of the Polygram transaction is not clear from the record. There is no evidence as to whether plaintiff's arrangement with Polygram is a binding contract or simply nonbinding expressions of intent. Hence, it is unclear whether Polygram has the right to walk away from the deal. More important, there is no evidence suggesting that the Turner broadcast would be likely to cause Polygram to do so.

Taking these considerations together, the Court is unpersuaded that the denial of injunctive relief would be likely to result in any significant harm to the plaintiff even if the denial is erroneous.

Turner claims that the issuance of an injunction will cause substantial harm to it. It has advertised and promoted the September 3 premiere of this movie for weeks. It claims that it will lose $2 million to $2.5 million in revenues if the film is not shown on September 3. (Grupp Decl. ¶ 2)

It is far from clear that the issuance of an injunction against infringement of the plaintiff's footage would prevent the telecast on September 3. Turner has submitted no such evidence. The colloquy with counsel gives reason to conclude that Turner could have edited out the allegedly infringing footage if an injunction had been issued on September 1.[9] Indeed, it was on that basis that the Court held an evidentiary hearing on the Sunday of a holiday weekend rather than waiting, as plaintiff had requested, until the morning of September 3. In consequence, the Court believes that Turner overstated the adverse impact on it that would have flowed from the issuance of an injunction at that time.

In the last analysis, the Court concludes that the losing party on this motion will suffer some inconvenience and risk. But it declines to find that the balance of hardships tips decidedly in favor of the plaintiff.

9. Moreover, Turner has known of plaintiff's specific claims since Friday, August 30 (CX A), and, if it thought it advisable, could have prepared a version of Story from which the allegedly infringing segments had been removed for use in the event an injunction issued.

*Conclusion*

For the foregoing reasons, the motion for a preliminary injunction is denied.[10]

SO ORDERED.

10. This disposition of the motion makes it unnecessary to consider the effect of plaintiff's apparent failure to give notice of the motion to defendant MA notwithstanding that plaintiff seeks relief only against the Turner defendants.