**ELVIS PRESLEY ENTERPRISES, INC., a Tennessee Corporation; National Bank of Commerce, trustee of the Promenade Trust; Sofa Entertainment, Inc., a California corporation; Jane Meadows Allen, trustee of the Allen Family Revocable Living Trust; Jerry Leiber, individually dba Jerry Leiber Music; Mike Stoller, individually dba Mike Stoller Music; Julian J. Aberbach, an individual; Alfred Wertheimer, an individual, Plaintiffs–Appellees,**

v.

PASSPORT VIDEO, a business of un-
known form and origin; Passport
International Productions, Inc., a
California Corporation; Passport In-
ternational Productions of Califor-
nia, Inc., a California Corporation;
Dante J. Pugliese, an individual, De-
fendants–Appellants,

and

Does, 1 Through 10, inclusive; Passport
Entertainment, a California
Corporation, Defendants.

No. 02–57011.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Aug. 8, 2003.

Filed Nov. 6, 2003.

Michael R. Blaha, Santa Monica, CA, for the defendants-appellants.

George R. Hedges and Kristen Bird, Quinn Emanuel Urquhart Oliver & Hedges, LLP, Los Angeles, CA, for the plaintiffs-appellees.

Before NOONAN, TALLMAN, and RAWLINSON, Circuit Judges.

Opinion by Judge TALLMAN; Dissent by Judge NOONAN

## OPINION

TALLMAN, Circuit Judge:

The King is dead. His legacy, and those who wish to profit from it, remain very much alive. To what extent may a film maker, under the banner of "fair use," incorporate video clips, photographs, and music into a biography about Elvis Presley without permission from the copyright owners of those materials? The district court—weighing the four statutory fair use factors under 17 U.S.C. § 107—held that the film biographer in this case likely did not use the copyrighted materials fairly and enjoined the film maker from further distribution of its biography. We affirm.

I

A

Plaintiffs are a group of companies and individuals holding copyrights in various materials relating to Elvis Presley. For example, plaintiff SOFA Entertainment, Inc., is the registered owner of several Elvis appearances on *The Ed Sullivan Show.* Plaintiff Promenade Trust owns the copyright to two television specials featuring Elvis: *The Elvis 1968 Comeback Special* and *Elvis Aloha from Hawaii.* Plaintiff Allen Family Revocable Living Trust owns the copyright to the 1956 episode of *The Steve Allen Show* that featured Elvis as a guest.

Plaintiffs' copyright holdings extend beyond the television medium. Plaintiffs Jerry Leiber and Mike Stoller are songwriters who own copyrights in many of Elvis' most famous songs, including *Jailhouse Rock* and *Hound Dog.* Plaintiff Alfred Wertheimer is a professional photographer who owns numerous copyrighted photographs of Elvis.

Many Plaintiffs are in the business of licensing their copyrights. For example, SOFA Entertainment charges $10,000 per minute for use of Elvis' appearances on *The Ed Sullivan Show.*

B

Passport Entertainment and its related entities (collectively "Passport") produced

and sold *The Definitive Elvis,* a 16–hour video documentary about the life of Elvis Presley. *The Definitive Elvis* sold for $99 at retail. Plaintiffs allege that thousands of copies were sent to retail outlets and other distributors. On its box, *The Definitive Elvis* describes itself as

> an all-encompassing, in-depth look at the life and career of a man whose popularity is unrivaled in the history of show business and who continues to attract millions of new fans each year. This ground-breaking, sixteen-hour series is brimming with classic film clips, rare home movies, [and] never-before-seen photos . . .
>
> . . . .
>
> Every **Film and Television Appearance** is represented in this series as well as **Rare Footage Of Many of Elvis' Tours & Concerts**

(emphasis in original).

The biography itself is indeed exhaustive. The producers interviewed over 200 people regarding virtually all aspects of Elvis' life. The documentary is divided into 16 one-hour episodes, each with its own theme. For example, one episode is entitled "The Army Years," whereas another—"The Spiritual Soul of Elvis"— chronicles the religious themes of Elvis' life and music.

*The Definitive Elvis* uses Plaintiffs' copyrighted materials in a variety of ways. With the video footage, the documentary often uses shots of Elvis appearing on television while a narrator or interviewee talks over the film. These clips range from only a few seconds in length to portions running as long as 30 seconds. In some instances, the clips are the subject of audio commentary, while in other instances they would more properly be characterized as video "filler" because the commentator is discussing a subject different from or more general than Elvis' performance on a particular television show. But also significant is the frequency with which the copyrighted video footage is used. *The Definitive Elvis* employs these clips, in many instances, repeatedly. In total, at least 5% to 10% of *The Definitive Elvis* uses Plaintiffs' copyrighted materials.

Use of the video footage, however, is not limited to brief clips. In several instances, the audio commentary discusses Elvis' appearance on a show and then, without additional voice-over, a clip is played from the show featuring Elvis. For example, one excerpt from *The Steve Allen* show plays continuously for over one minute without interruption. This excerpt includes the heart of Elvis' famous "Hound Dog" appearance on *The Steve Allen* show. Many other clips from Elvis' appearances on various television shows run between 10 and 30 seconds.

In the aggregate, the excerpts comprise a substantial portion of Elvis' total appearances on many of these shows. For example, almost all of Elvis' appearance on *The Steve Allen Show* is contained in *The Definitive Elvis.* Thirty-five percent of his appearances on *The Ed Sullivan Show* is replayed, as well as three minutes from *The 1968 Comeback Special.*

The use of Plaintiffs' copyrighted still photographs and music is more subtle and difficult to spot. The photographs are used in a way similar to some of the video footage: the photograph is displayed as video filler while a commentator discusses a topic. The photographs are not highlighted or discussed as objects of the commentary like many of the video pieces are. Finally, the songs are played both as background music and in excerpts from Elvis' concerts, television appearances, and movies.

### C

Plaintiffs sued Passport for copyright infringement. It is undisputed that Pass-

port used Plaintiffs' copyrighted materials in *The Definitive Elvis* without obtaining licenses. Indeed, Passport had sought a license from at least one of the Plaintiffs, Elvis Presley Enterprises, Inc., but it refused Passport's request since it planned to release its own anthology in 2004 to commemorate the 50th anniversary of the beginning of Elvis' musical career. Passport, however, asserts that its use of the copyrighted materials was "fair use" under 17 U.S.C. § 107.

Plaintiffs moved for a preliminary injunction, which was granted by the district court after a hearing. The district court found that Passport's use of Plaintiffs' copyrighted materials was likely not fair use. The court enjoined Passport from selling or distributing *The Definitive Elvis.* Passport timely appeals.

## II

■ This Court has jurisdiction over an appeal from an order granting a preliminary injunction under 28 U.S.C. § 1292(a). A district court's order granting a preliminary injunction is reviewed for an abuse of discretion. *Gerling Global Reinsurance Corp. of Am. v. Low,* 240 F.3d 739, 743 (9th Cir.2001). A district court abuses its discretion if it bases its decision on an erroneous legal standard or clearly erroneous factual findings. *Id.*

## III

### A

Passport first argues that the preliminary injunction is unconstitutional because (1) Passport can present a plausible fair use defense; (2) commentators have suggested in such situations that a preliminary injunction might be an unconstitutional prior restraint; and (3) some cases have refused to grant preliminary injunc-

tions based on, at least in part, First Amendment principles.

■ We need not jump into this briar patch. We have held that First Amendment concerns in copyright cases are subsumed within the fair use inquiry. In other words, if the use of the alleged infringer is not fair use, there are no First Amendment prohibitions against granting a preliminary injunction. *See, e.g., A & M Records, Inc. v. Napster, Inc.,* 239 F.3d 1004, 1028 (9th Cir.2001) ("Uses of copyrighted material that are not fair uses are rightfully enjoined."); *Dr. Seuss Enters. v. Penguin Books USA, Inc.,* 109 F.3d 1394, 1403 (9th Cir.1997).

### B

■ Passport next alleges that Plaintiffs' delay in bringing their suit prejudiced Passport after Passport invested more than $2 million in the venture, and thus injunctive relief is barred by laches. Some Plaintiffs learned of Passport's possible use of their copyrighted materials in June 2001, but did not file their complaint until September 2002. Passport asserts that this case is similar to *Trust Co. Bank v. Putnam Publishing Group, Inc.,* 5 U.S.P.Q.2d 1874 (C.D.Cal.1988).

Passport's contentions have little merit. First, Passport did not publish *The Definitive Elvis* until July 2002. Plaintiffs filed suit within two months. There was no way for Plaintiffs to assess whether Passport's use would be fair until they saw the final product. Second, as Plaintiffs point out, if Plaintiffs had brought suit before the work was published it might have raised a viable prior restraint argument by Passport. *See, e.g., Globe Int'l, Inc. v. Nat'l Enquirer, Inc.,* 27 Media L. Rep. 1491, 1999 WL 727232, at *1 (C.D.Cal. 1999). Finally, Passport's reliance on *Trust Co. Bank* is unavailing. There, the plaintiffs knew the exact content of the

infringing book well over two years before they brought suit. 5 U.S.P.Q.2d at 1877, 1988 WL 62755. Based on that fact, as well as the substantial investment by the defendants in the interim, the district court held that the plaintiffs were barred by laches. *Id.* at 1879–80, 1988 WL 62755. Here, conversely, Plaintiffs did not have knowledge of the final product produced by Passport until July 2002, and their subsequent complaint filed weeks later was not an unreasonable delay.

## IV

■ A preliminary injunction should be granted if a plaintiff can show either: (1) a combination of probable success on the merits and the possibility of irreparable harm; or (2) that serious questions are raised and the balance of hardships tilt in the plaintiff's favor. *A & M Records*, 239 F.3d at 1013. When a plaintiff is likely to succeed on the merits of a copyright infringement claim, irreparable harm is presumed. *Triad Sys. Corp. v. Southeastern Exp. Co.*, 64 F.3d 1330, 1335(9th Cir.1995). The only argument Passport presents to counter the irreparable harm presumption is the laches argument rejected above. Therefore, this case turns on whether the district court abused its discretion when it determined that Plaintiffs will probably succeed on the merits. Fair use is the only issue in contention on the merits.

■ 17 U.S.C. § 107 states:

the fair use of a copyrighted work … for purposes such as criticism, comment, news reporting, teaching (including multiple copies for classroom use), scholarship, or research, is not an infringement of copyright. In determining whether the use made of a work in any particular case is a fair use the factors to be considered shall include—

(1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes;

(2) the nature of the copyrighted work;

(3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and

(4) the effect of the use upon the potential market for and value of the copyrighted work.

This analysis should not be "simplified with bright-line rules," but instead requires a "case-by-case analysis." *Los Angeles News Serv. v. CBS Broad., Inc.*, 305 F.3d 924, 938 (9th Cir.2002), *amended by* 313 F.3d 1093 (2002) (quoting *Campbell v. Acuff–Rose Music, Inc.*, 510 U.S. 569, 577–78, 114 S.Ct. 1164, 127 L.Ed.2d 500 (1994)). Contrary to the divide and conquer approach taken by the dissent, we may not treat the factors in isolation from one another. "All are to be explored, and the results weighed together, in light of the purposes of copyright." *Los Angeles News Serv.*, 305 F.3d at 938. *See also Kelly v. Arriba*, 336 F.3d 811, 822 (9th Cir.2002).

### A

■ We first address the purpose and character of Passport's use of Plaintiffs' copyrighted materials. Although not controlling, the fact that a new use is commercial as opposed to non-profit weighs against a finding of fair use. *Harper & Row Publishers, Inc. v. Nation Enters.*, 471 U.S. 539, 562, 105 S.Ct. 2218, 85 L.Ed.2d 588 (1985). And the degree to which the new user exploits the copyright for commercial gain—as opposed to incidental use as part of a commercial enterprise—affects the weight we afford commercial nature as a factor. *See e.g., Kelly* 336 F.3d at 818; *see also Harper & Row,* 471 U.S. at 562, 105 S.Ct. 2218("The crux of the profit/nonprofit distinction is not

whether the sole motive of the use is monetary gain but whether the user stands to profit from exploitation of the copyrighted material without paying the customary price.").

More importantly for the first fair-use factor, however, is the "transformative" nature of the new work. *Campbell,* 510 U.S. at 579, 114 S.Ct. 1164; *CBS Broadcasting,* 305 F.3d at 938. Specifically, we ask "whether the new work ... merely supersedes the objects of the original creation, or instead adds something new, with a further purpose or different character, altering the first with new expression, meaning, or message...." *Campbell,* 510 U.S. at 579, 114 S.Ct. 1164 (citation and quotation marks omitted). The more transformative a new work, the less significant other inquiries, such as commercialism, become. *Id.*

Two district courts have found that the use of film clips in biographies is transformative. In *Monster Communications, Inc. v. Turner Broadcasting System, Inc.,* 935 F.Supp. 490, 491 (S.D.N.Y.1996), the district court considered whether a movie biography about Muhammad Ali violated the plaintiff's copyrights in video footage that was used in the boxer's biography for less then two minutes. The court found that the biography, while commercial, "constitutes a combination of comment, criticism, scholarship and research" concerning "a figure of legitimate public concern" and thus the purpose and character of the biography weighed in favor of fair use. *Id.* at 493–94 (citation and quotation marks omitted).

In *Hofheinz v. A & E Television Networks,* 146 F.Supp.2d 442, 444 (S.D.N.Y. 2001), the court considered whether A & E's use of copyrighted film clips for a biography of actor Peter Graves was fair use. The court found that the biography was transformative because use of a movie trailer clip for a "B" movie "was not shown to recreate the creative expression reposing in plaintiff's film." *Id.* at 446. The biography narrator introduced the movie clip as outdated and "campy." *Id.* at 444. Its purpose was to "enabl[e] the viewer to understand the actor's modest beginnings in the film business." *Id.* at 446–47.

The district court below found that the purpose and character of *The Definitive Elvis* will likely weigh against a finding of fair use. We cannot say, based on this record, that the district court abused its discretion.

First, Passport's use, while a biography, is clearly commercial in nature. But more significantly, Passport seeks to profit directly from the copyrights it uses without a license. One of the most salient selling points on the box of *The Definitive Elvis* is that "Every **Film and Television Appearance** is represented." Passport is not advertising a scholarly critique or historical analysis, but instead seeks to profit at least in part from the inherent entertainment value of Elvis' appearances on such shows as *The Steve Allen Show, The Ed Sullivan Show,* and *The 1968 Comeback Special.* Passport's claim that this is scholarly research containing biographical comments on the life of Elvis is not dispositive of the fair use inquiry.

Second, Passport's use of Plaintiffs' copyrights is not consistently transformative. True, Passport's use of many of the television clips is transformative because the clips play for only a few seconds and are used for reference purposes while a narrator talks over them or interviewees explain their context in Elvis' career. But voice-overs do not necessarily transform a work. *See L.A. News Serv. v. KCAL–TV Channel 9,* 108 F.3d 1119, 1122 (9th Cir. 1997). " 'There must be real, substantial condensation of the materials ... and not merely the facile use of scissors; or ex-

tracts of the essential parts, constituting the chief value of the original work.'" *CBS Broad., Inc.*, 305 F.3d at 939(quoting *Folsom v. Marsh*, 9 F. Cas. 342, 345 (C.C.D.Mass.1841) (Story, J.)).

It would be impossible to produce a biography of Elvis without showing some of his most famous television appearances for reference purposes. But some of the clips are played without much interruption, if any. The purpose of showing these clips likely goes beyond merely making a reference for a biography, but instead serves the same intrinsic entertainment value that is protected by Plaintiffs' copyrights.

We think Passport's use of significant portions of *The Steve Allen Show* is especially troubling. While showing a clip from these television shows is permissible to note their historical value, Passport crosses the line by making more than mere references to these events and instead shows significant portions of these copyrighted materials. Finally, Passport does not even offer up a specific justification regarding its use of Plaintiffs' copyrights in still photographs and music.

This first factor is a close issue. Courts have described new works as "transformative" when the works use copyrighted material for purposes distinct from the purpose of the original material. Here, Passport's use of many of the television clips is transformative because they are cited as historical reference points in the life of a remarkable entertainer. *The Definitive Elvis* "nature as a biography transforms the purpose of showing these clips from pure entertainment to telling part of the story of Elvis" life. But many of the film clips seem to be used in excess of this benign purpose, and instead are simply rebroadcast for entertainment purposes that Plaintiffs rightfully own. This comes as no surprise to the viewer since

*The Definitive Elvis* advertises as much on its external packaging.

We need not decide how we would resolve this factor were we to review it de novo. For our inquiry is simply whether the district court abused its discretion. The district court's decision that the first factor weighs against fair use was not based on an erroneous legal standard or clearly erroneous factual finding. *See A & M Records, Inc.*, 239 F.3d at 1015.

**B**

We next examine the nature of Plaintiffs' copyrighted works. "The law generally recognizes a greater need to disseminate factual works than works of fiction or fantasy." *Harper & Row*, 471 U.S. at 563, 105 S.Ct. 2218. In other words, "this factor calls for recognition that some works are closer to the core of intended copyright protection than others, with the consequence that fair use is more difficult to establish when the former works are copied." *Campbell*, 510 U.S. at 586, 114 S.Ct. 1164. Additionally, published works are more likely to qualify for fair use by subsequent users. *Kelly*, 336 F.3d at 820.

For example, works such as original songs, motion pictures, and photographs taken for aesthetic purposes, are creative in nature and thus fit squarely within the core of copyright protection. *See Sony Corp. v. Universal City Studios, Inc.*, 464 U.S. 417, 455 n. 40, 104 S.Ct. 774, 78 L.Ed.2d 574 (1984); *Kelly*, 336 F.3d at 820. But works such as news broadcasts and news video footage are more factual in nature and thus are more conducive to fair use. *See Sony*, 464 U.S. at 455 n. 40, 104 S.Ct. 774; *KCAL–TV*, 108 F.3d at 1122.

Here, the television footage is a close call. On the one hand, the appearances and concerts are creative in nature and thus fit into a category of work copyright is designed to protect. On the other hand,

the footage is of such a significance that it can properly be characterized as "newsworthy" events. The fact that these appearances have already been broadcast on television also weighs in Passport's favor.

But the still photographs and songs used throughout *The Definitive Elvis* require a different analysis. The pictures, in most instances, do not depict newsworthy events, nor are the pictures inherently newsworthy, but instead comprise the photographer's artistic product. Moreover, it is undisputed that original musical compositions are inherently creative. *See Campbell*, 510 U.S. at 586, 114 S.Ct. 1164; *A & M Records*, 239 F.3d at 1016.

The district court found that in total this factor weighed in Plaintiffs' favor. We cannot say that the district court abused its discretion in reaching that conclusion.

### C

The third factor is the amount and substantiality of the portion used in relation to the copyrighted work as a whole. This factor evaluates both the quantity of the work taken and the quality and importance of the portion taken. *Campbell*, 510 U.S. at 586, 114 S.Ct. 1164. Regarding the quantity, copying "may not be excused merely because it is insubstantial with respect to the *infringing* work." *Harper & Row*, 471 U.S. at 565, 105 S.Ct. 2218(emphasis in original). But if the amount used is substantial with respect to the infringing work, it is evidence of the value of the copyrighted work. *Id.* Regarding the qualitative nature of the work used, we look to see whether "the heart" of the copyrighted work is taken—in other words, whether the portion taken is the "most likely to be newsworthy and important in licensing serialization." *Campbell*, 510 U.S. at 586, 114 S.Ct. 1164; *see also CBS Broad.*, 305 F.3d at 941. Finally, if the new user only copies as much as necessary for his or her

intended use, this factor will not weigh against the new user. *Kelly*, 336 F.3d at 820–21.

The district court found that this factor also weighs in Plaintiffs' favor. This conclusion was not an abuse of discretion.

Passport's use of clips from television appearances, although in most cases of short duration, were repeated numerous times throughout the tapes. While using a small number of clips to reference an event for biographical purposes seems fair, using a clip over and over will likely no longer serve a biographical purpose. Additionally, some of the clips were not short in length. Passport's use of Elvis' appearance on *The Steve Allen Show* plays for over a minute and many more clips play for more than just a few seconds.

Additionally, although the clips are relatively short when compared to the entire shows that are copyrighted, they are in many instances the heart of the work. What makes these copyrighted works valuable is Elvis' appearance on the shows, in many cases singing the most familiar passages of his most popular songs. Plaintiffs are in the business of licensing these copyrights. Taking key portions extracts the most valuable part of Plaintiffs' copyrighted works. With respect to the photographs, the entire picture is often used. The music, admittedly, is usually played only for a few seconds.

But when we consider all these facts together, we cannot say that the district court abused its discretion in finding that this factor weighed in Plaintiffs' favor.

### D

The last, and "undoubtedly the single most important" of all the factors, is the effect the use will have on the potential market for and value of the copyrighted works. *Harper & Row*, 471 U.S. at 566,

105 S.Ct. 2218. We must "consider not only the extent of market harm caused by the particular actions of the alleged infringer, but also whether unrestricted and widespread conduct of the sort engaged in by the defendant ... would result in a substantially adverse impact on the potential market for the original." *Campbell,* 510 U.S. at 590, 114 S.Ct. 1164(quotation marks omitted). The more transformative the new work, the less likely the new work's use of copyrighted materials will affect the market for the materials. *See CBS Broad.,* 305 F.3d at 941. Finally, if the purpose of the new work is commercial in nature, "the likelihood [of market harm] may be presumed." *A & M Records,* 239 F.3d at 1016(quoting *Sony,* 464 U.S. at 451, 104 S.Ct. 774).

The district court found that Passport's use of Plaintiffs' copyrighted materials likely does affect the market for those materials. This conclusion was not clearly erroneous.

First, Passport's use is commercial in nature, and thus we can assume market harm. *See id.* Second, Passport has expressly advertised that *The Definitive Elvis* contains the television appearances for which Plaintiffs normally charge a licensing fee. If this type of use became widespread, it would likely undermine the market for selling Plaintiffs' copyrighted material. This conclusion, however, does not apply to the music and still photographs. It seems unlikely that someone in the market for these materials would purchase *The Definitive Elvis* instead of a properly licensed product. Third, Passport's use of the television appearances was, in some instances, not transformative, and therefore these uses are likely to affect the market because they serve the same purpose as Plaintiffs' original works.

We do not think this factor weighs strongly in either side's favor. But, for the reasons stated above that support the district court's decision, we cannot say that the district court abused its discretion in analyzing this factor. Furthermore, because we do not see any legal error or clear error in the district court's factual findings underlying any of the fair-use factors, we hold that the district court did not abuse its discretion in granting the preliminary injunction.

## V

We emphasize that our holding today is not intended to express how we would rule were we examining the case *ab initio* as district judges. Instead, we confine our review to whether the district court abused its discretion when it weighed the four statutory fair-use factors together and determined that Plaintiffs would likely succeed on the merits. Although we might view this case as closer than the district court saw it, we hold there was no abuse of discretion in the court's decision to grant Plaintiffs' requested relief.

AFFIRMED.

NOONAN, Circuit Judge, dissenting:

The district court has misstated critical facts and has misstated the governing law. For these reasons, we should reverse its grant of a preliminary injunction.

*The Facts.* That the plaintiffs hold copyrighted materials and the defendant used portions of them were not and are not disputed facts. Passport's principal defense was that its use of the materials was fair use. Here the facts were disputed. Here the district court made critical misstatements as follows:

Finding of Fact 11: "The portions of *The Ed Sullivan Show* included on *The Definitive Elvis* are exact reproductions; the Defendants did not add anything new

or transformative to the copyrighted work."

Finding of Fact 13: "The portions of *Ed Sullivan's Rock & Roll Classics—Elvis Presley* included on *The Definitive Elvis* are exact reproductions; the Defendants did not add anything new or transformative to the copyrighted work."

Finding of Fact 22: "Portions of 'The Elvis 1968 Comeback Special,' 'Elvis Aloha From Hawaii,' and 'Elvis in Concert' have been copied and appear in *The Definitive Elvis*. The portions of these works included on *The Definitive Elvis* are exact reproductions; the Defendants did not add anything new or transformative to the copyrighted works."

Finding of Fact 35: "Portions of the 1956 episode of *The Steve Allen Show* featuring Elvis Presley are copied and appear on *The Definitive Elvis*. The portions of *The Steve Allen Show* included on *The Definitive Elvis* are exact reproductions; the Defendants did not add anything new or transformative to the copyrighted works."

In each of these instances, there are in fact voice-overs produced by Passport. None of the Findings of Fact acknowledge the existence of the voice-overs. These omissions are capital. The voice-overs are indisputably new.

Not only are the ignored voice-overs new. They are transformative. They turn the original Presley shows into part of a substantial biography. The court's denials that newness and transformative quality are characteristic of these uses are substantial errors of fact. To give one example, in the clips taken from *The Steve Allen Show*, the voice-over includes comments from the narrator, Elvis's friends and band members about his appearance on the show and later reactions to his performance from Elvis himself. Rather than regurgitation, Passport provides independent analysis of the appearance and frames it in the context of Elvis's life and career.

In addition to these large errors as to the new and transformative uses, in Finding of Fact 19 on the material used from Elvis Presley Home Movies, the district court failed to note the extraordinarily small amount of material used by Passport. The length of the clip is 4 seconds. It was error to treat as unfair use such a tiny fragment integrated into a large biographical mosaic.

Finding of Fact 43 denies newness or transformative quality to photos copyrighted by photographer Alfred Wertheimer. As in the rest of the documentary, voice-overs accompany many if not all of the photos. The photos are not presented for their own sake. They are intelligently incorporated into the larger, 16-hour biography that Passport has made. Fans wanting photos of Elvis would not find *The Definitive Elvis* to be a viable substitute. The use in the biography is new and transformative.

Finding of Fact 25 bears on music whose copyright is in The Promenade Trust and Finding of Fact 40 bears on music whose copyright holder is L & S. As in its other findings, the district court found nothing new or transformative in the use made by Passport. However, the music is used largely as background, and the median length of the excerpts played was about ten seconds. Voice-overs accompany much of the music, rendering large parts of the excerpts virtually inaudible. Findings of Fact 25 and 40 fail to address the audibility of the music and the relation of the new words to what is played.

The district court adopted eight of the plaintiffs' Findings of Fact on fair use. Six are demonstrably wrong. The two on music are ambiguous. None can be relied upon. Why the court committed these

errors is not difficult to discover. The court adopted wholesale the twelve pages entitled "Findings of Fact" prepared by the plaintiffs. With the exception of eliminating five irrelevant sentences, the court did not change a comma or a phrase.

Such a practice of using findings prepared by a party is not unusual. It is not forbidden, although a judge may not abdicate his responsibility by continuing to omit key facts that have been omitted by the party on whose work the judge is relying. In a copyright case where fair use is the issue, this practice destroys the delicate discrimination necessary if fair use is to be fairly evaluated. We have more than once stated that such mass adoption of "the suggestions" of a party will require "special scrutiny" on appeal. *L.K. Comstock & Co. v. United Eng'rs & Constructors Inc.*, 880 F.2d 219, 222 (9th Cir.1989); *Photo Elecs. Corp. v. England*, 581 F.2d 772, 776–77 (9th Cir.1978). In the instant case, the repeated errors committed by the district court because of its reliance on the drafting of the plaintiffs relieve us of any duty to defer to the trial judge.

*The Law.* The district court found the plaintiffs' statement of the law as exact as the plaintiffs' rendition of the facts. Doing so, the court repeated several truisms, but on the critical point at issue it again fell into serious error. What the plaintiffs, and the district court following the plaintiffs, neglected to note is the need of an examination of "the public interest in determining the appropriateness of a preliminary injunction." *Sammartano v. First Judicial District*, 303 F.3d 959, 974 (9th Cir.2002); *see also Fund for Animals v. Lujan*, 962 F.2d 1391, 1400 (9th Cir.1992). *Sammartano* makes clear that "[w]hile we have at times subsumed this inquiry into the balancing of hardships, it is better seen as an element that deserves separate attention in cases where the public interest

may be affected." *Sammartano*, 303 F.3d at 974(citation omitted).

The resolution of this case and the grant of the preliminary injunction affect the public interest. The King is dead but his legacy remains very much alive. *The Definitive Elvis* documentary purports to offer the public, as described by its packaging, "an all-encompassing, in-depth look at the life and career of a man whose popularity is unrivaled in the history of show business and who continues to attract millions of new fans each year." A review by a more objective source, *The USA Today*, described the documentary as "the most comprehensive overview yet of the King's personal and professional life." Edna Gunderson, *"The Definitive Elvis": Eight CDs, 16 Hours, $99*, USA Today, July 19, 2002, at 1E.

In *Abend v. MCA*, 863 F.2d 1465, 1479 (9th Cir.1988), *aff'd sub nom. Stewart v. Abend*, 495 U.S. 207, 110 S.Ct. 1750, 109 L.Ed.2d 184 (1990), another case not addressed by the district court's Conclusions of Law, our court found that because "an injunction could cause public injury by denying the public the opportunity to view a classic film," Hitchock's *Rear Window*, monetary damages would adequately compensate the plaintiff for any infringement. Other courts have reached similar conclusions, finding "a strong public interest favoring the publication of books and novels." *Trust Co. Bank v. Putnam Publ'g Group, Inc.*, 5 U.S.P.Q.2d 1874, 1877 (C.D.Cal.1988). There is "little doubt" that a television biography of Muhammed Ali "is a subject of public interest," *Monster Communications, Inc. v. Turner Broad. Sys., Inc.*, 935 F.Supp. 490, 494 (S.D.N.Y. 1996). There is equally little doubt of the public interest in Elvis.

The district court conducted no analysis of the public interest, either as part of a balancing of hardships or as the separate

inquiry called for by *Sammartano.* This failure also led to the district court ignoring money damages as the appropriate equitable remedy for any infringement where fair use was not shown. *Abend,* 863 F.2d at 1479. In a case of this kind involving the biography of a man with an immense following, it is necessary for a court to keep in mind that injunctions are a device of equity and are to be used equitably, and that a court suppressing speech must be aware that it is trenching on a zone made sacred by the First Amendment. *See* Mark A. Lemley & Eugene Volokh, *Freedom of Speech and Injunctions in Intellectual Property Cases,* 48 Duke L.J. 147 (1998).

"We review a grant or denial of a preliminary injunction for abuse of discretion," and "[a]pplication of erroneous legal principles represents an abuse of discretion by the district court." *A & M Records, Inc. v. Napster, Inc.,* 239 F.3d 1004, 1013 (9th Cir.2001). The district court's failure to apply the appropriate legal standard was such an abuse of discretion.

As to each of the factors bearing on fair use, the present opinion of the court defers to the factfinding of the district court and emphasizes that "our holding today is not intended to express how we would rule were we examining the case *ab initio* as district judges." But given the string of factual errors committed by the district judge, we make a mistake in according such deference. The mistake is magnified by the district court's and this court's remarkable error of law in failing to weigh the public interest in a biography of Elvis.

For these reasons, the grant of the preliminary injunction was a miscarriage of justice.