**SOFA ENTERTAINMENT, INC., Plaintiff,**

v.

**DODGER PRODUCTIONS, INC., Defendant.**

**Case No. CV 08–02616 DMG (PJWx).**

United States District Court, C.D. California.

July 12, 2010.

Jaime W. Marquart, Baker Marquart Crone and Hawxhurst, Noah S. Helpern, Quinn Emanuel Urquhart Oliver and Hedges LLP, Los Angeles, CA, for Plaintiff.

David S. Korzenik, Miller Korzenik Sommers LLP, New York, NY, Nicholas Morgan, Walter R. Sadler, Leopold Petrich & Smith, Los Angeles, CA, for Defendant.

## ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND DENYING PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT [22, 27]

DOLLY M. GEE, District Judge.

This matter is before the Court on Defendant Dodger Productions, Inc.'s Motion for Summary Judgment [Doc. # 22], filed on September 24, 2009, and Plaintiff Sofa Entertainment, Inc.'s Motion for Partial Summary Judgment [Doc. # 27], filed on September 28, 2009. The Court has considered the documents submitted in connection with these motions as well as the oral arguments presented at the hearing on July 9, 2010. For the reasons set forth below, Defendant's motion is GRANTED, and Plaintiff's motion is DENIED.

## I.

### *PROCEDURAL HISTORY*

On April 21, 2008, Plaintiff Sofa Entertainment, Inc. filed a Complaint with this Court, asserting a single copyright infringement claim against Defendant Dodger Productions, Inc. and Doe defendants 1 through 10. On September 24, 2009, Defendant filed a motion for summary judgment on the basis of its "fair use" affirmative defense. On September 26, 2009, Plaintiff filed its motion for partial summary judgment on the issues of its ownership of, and Defendant's unauthorized copying of, the copyrighted work at issue in this litigation; Plaintiff also moved for summary judgment on the ground that all of Defendant's affirmative defenses fail as a matter of law. Each party filed an Opposition on October 19, 2009, and each

filed a Reply on October 26, 2009. On November 2, 2009, the cross-motions for summary judgment were taken off calendar and under submission; thereafter, this case was transferred to the undersigned's calendar.

## II.

### FACTUAL BACKGROUND

The facts material to the Court's decision on the instant motions are not in dispute.[1] This action arises out of Defendant's use of a seven-second clip ("the Clip") from the January 2, 1966 episode of *The Ed Sullivan Show* in which Plaintiff owns a copyright. Plaintiff Sofa Entertainment, Inc. is in the business of licensing portions of its library of classic programming for use in film, television, and other media. Pl's Response to Def's Separate Stmt. ("Pl's Response") ¶ 1; Def's Separate Stmt. of Genuine Issues ("Def's Sep. Stmt.") ¶ 1. Defendant Dodger Productions, Inc. is the producer of the play *Jersey Boys*, a successful musical production based on the lives of various members of the musical group the Four Seasons. Pl's Response ¶¶ 2, 6–8.

Plaintiff owns the copyrights to a number of television shows, feature films, and musical recordings, including the entire library of *The Ed Sullivan Show*, a popular television variety program hosted by Ed Sullivan from 1948 to 1971, during which time the program featured numerous musical performers, including the Four Seasons. Led by singer Frankie Valli, the Four Seasons were a rock and roll group that rose to international fame in the 1960s. Def's Sep. Stmt. ¶¶ 2–8. The Four Seasons topped the charts throughout the 1960s, with more than twenty songs rising above # 30 on the Billboard Hot 100 Singles chart during that decade. *Id.* at ¶ 9. At a critical point in their career, the Four Seasons were given an opportunity to perform on *The Ed Sullivan Show. Id.* at ¶ 6. The group performed several times on the program, including on the January 2, 1966 episode. *Id.* The parties agree that, in the 1960s, performances on *The Ed Sullivan Show* played an important role in the success of many musical performers and groups. *Id.* at ¶ 5.

Defendant's production, *Jersey Boys*, has been staged in multiple cities including New York, Chicago, Las Vegas, London, and Los Angeles. *Id.* at ¶ 7. *Jersey Boys* is a dramatic work that tells the story of the Four Seasons' rise to fame and incorporates historic video footage as part of the show. *Id.* at ¶ 10. The play runs over two hours, and a seven-second clip of Ed Sullivan introducing the Four Seasons on the January 2, 1966 episode of *The Ed Sullivan Show* ("the Clip")[2] is displayed

---

1. The Court does not rely on any inadmissible evidence in reaching its decision here. The Court is able to distinguish facts from argument. Each party makes a number of objections to the other's characterizations of the import of, or inferences properly drawn from, various pieces of evidence. To the extent that those objections are to permissible opinion testimony or to what amounts to legal argument, the objections are overruled. Defendant's objections to statements in, and exhibits to, the declaration of Andrew Solt ("Solt Declaration") as "improper legal conclusions" regarding Plaintiff's copyright registration are similarly overruled. Except where otherwise noted in this Order, Defendant's objections to statements in the Solt Declaration are not sufficient to controvert Plaintiff's showing regarding the facts set forth in that declaration.

2. Defendant argues, without reference to any supporting evidence, that the entire January 2, 1966 episode of *The Ed Sullivan Show* "is likely 45 to 50 minutes in length." Def. Memo of P. & A. in Support of Mot. for Summ. J'mt ("Def. Mot.") at 13:25–28. Opposing Defendant's motion, Plaintiff does not dispute this estimate; and, in support of its own motion, Plaintiff introduces no evidence about the duration of the entire episode from which the Clip is excerpted.

on a large screen at the end of the play's first act. Pl's Response ¶¶ 7, 15; Def's Sep. Stmt. ¶¶ 11, 14.

Immediately before the Clip is played, an actor portraying Four Seasons member Bob Gaudio addresses the *Jersey Boys* audience:

> Around this time there was a little dust-up called The British Invasion. Britannia's ruling the air waves, so we start our own American revolution. The battle begins on Sunday night at eight o'clock and the whole world is watching.

Pl's Response ¶ 22. As the actor speaks these lines, the actors portraying the band are seen preparing themselves to perform, and the old-style CBS cameras bearing the CBS logo roll across the stage. Pl's Response ¶ 23 (also admitting for purposes of this motion that "[t]he audience is led to feel they are backstage with the band-performers, reading their instruments, fac[ing] the back of the stage as if the Sullivan audience is in front of them").

In the Clip, Ed Sullivan has taken the stage and, striking his signature pose, introduces the Four Seasons to the studio audience: "Now ladies and gentlemen, here, for all of the youngsters in the country, the Four Seasons...." Def's Sep. Stmt. ¶ 11. As he concludes, Mr. Sullivan waves his left hand toward where the Four Seasons are to perform, at which point the Clip ends and the actors in *Jersey Boys* perform a song on stage. *Id.* The parties do not dispute that the Clip reflects an important moment in the Four Seasons'

career. *Id.* at ¶ 6. The parties similarly do not dispute that Plaintiff has not licensed the Clip or any other portions of *The Ed Sullivan Show* to be used in *Jersey Boys* or any other production. *Id.* at ¶ 15.[3]

## III.

### STANDARD GOVERNING MOTIONS FOR SUMMARY JUDGMENT

Summary judgment should be granted "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c)(2); *accord Farrakhan v. Gregoire*, 590 F.3d 989, 1001 (9th Cir. 2010). Material facts are those that may affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). An issue is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

The moving party bears the initial burden of establishing the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Mattos v. Agarano*, 590 F.3d 1082, 1085 (9th Cir.2010); *see also Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1106 (9th Cir. 2000) ("In order to carry its burden of production, the moving party must either produce evidence negating an essential element of the nonmoving party's claim or

---

**3.** Defendant's objections to paragraphs 3 and 6 of the Solt Declaration as irrelevant and lacking foundation are overruled, and these objections are not sufficient to controvert Solt's statements as evidence that Plaintiff did not grant Defendant a license or other permission to use the Clip. *See* Solt Decl. ¶ 3 (attesting that Plaintiff owns the copyright to the January 2, 1966 episode of the Ed Sullivan Show, "a portion of which has been copied, without permission or license, in the play

*Jersey Boys* "); Solt Decl. ¶ 6 ("I have since confirmed that [Plaintiff] has not licensed any clips of the Ed Sullivan Show to be used in *Jersey Boys*, nor has it otherwise given Defendant permission to use any footage from that show in Defendant's various productions"); *see also* Def. Evidentiary Objections ("Def. Objections") at 2:3–6 ("The witness ... can only testify that [Plaintiff] did not license or permit use....").

defense or show that the nonmoving party does not have enough evidence of an essential element to carry its burden of persuasion at trial."). Once the moving party has met its initial burden, Rule 56(e) requires the nonmoving party to "go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex*, 477 U.S. at 324, 106 S.Ct. 2548; *accord Bias v. Moynihan*, 508 F.3d 1212, 1218 (9th Cir.2007). "[T]he inferences to be drawn from the underlying facts ... must be viewed in the light most favorable to the party opposing the motion." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). However, "an opposing party may not rely merely on allegations or denials in its own pleading." Fed.R.Civ.P. 56(e). Additionally, mere disagreement or the bald assertion that a genuine issue of material fact exists does not preclude the use of summary judgment. *Harper v. Wallingford*, 877 F.2d 728, 731 (9th Cir.1989).

## IV.

### *DISCUSSION*

Defendant moves for summary judgment on the basis of its "fair use" affirmative defense, and Plaintiff moves for partial summary judgment both on certain issues in connection with its copyright infringement claim and on the ground that all of Defendant's affirmative defenses fail as a matter of law. Even assuming that Plaintiff has established the absence of a genuine issue of material fact with respect to its ownership and Defendant's unauthorized use of the Clip, no infringement can be found if Defendant is entitled to prevail on its fair use defense as a matter of law. Accordingly, because the Court's ruling on fair use is dispositive, the Court need not, and does not, address Plaintiff's other arguments for partial summary judgment.

■ Copyright owners have certain "exclusive" rights in their copyrighted works.[4] 17 U.S.C. § 106; *Stewart v. Abend*, 495 U.S. 207, 220, 110 S.Ct. 1750, 109 L.Ed.2d 184 (1990) ("An author holds a bundle of exclusive rights in the copyrighted work, among them the right to copy and the right to incorporate the work into derivative works."). However, the "fair use of a copyrighted work ... is not an infringement of copyright." *Stewart*, 495 U.S. at 236, 110 S.Ct. 1750 ("The doctrine is an equitable rule of reason, which permits courts to avoid rigid application of the copyright statute when, on occasion, it would stifle the very creativity which that law is designed to foster." (internal quotations and citations omitted)); *see also Twentieth Century*, 422 U.S. at 156, 95 S.Ct. 2040 ("The limited scope of the copyright holder's statutory monopoly ... reflects a balance of competing claims upon the public interest: Creative work is to be encouraged and rewarded, but private motivation must ultimately serve the cause of promoting broad public availability of literature, music, and the other arts.").

As codified in the Copyright Act of 1976, the fair use doctrine requires consideration of at least "[t]he four factors identified by Congress as especially relevant in determining whether the use was fair." *Harper & Row Publishers, Inc. v. Nation Enterprises*, 471 U.S. 539, 560, 105 S.Ct. 2218, 85

---

4. "The Constitution gives Congress the power: 'To promote the Progress of Science and useful Arts, by securing for limited Times to Authors and Inventors the exclusive Right to their respective Writings and Discoveries.'"

*Twentieth Century Music Corp. v. Aiken*, 422 U.S. 151, 154 n. 2, 95 S.Ct. 2040, 45 L.Ed.2d 84 (1975) (quoting U.S. Const., art. I, § 8, cl. 8).

L.Ed.2d 588 (1985). The statute provides in relevant part that:

> [T]he fair use of a copyrighted work … for purposes such as criticism, comment, news reporting, teaching (including multiple copies for classroom use), scholarship, or research, is not an infringement of copyright. In determining whether the use made of a work in any particular case is a fair use the factors to be considered shall include—
>
> (1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes;
>
> (2) the nature of the copyrighted work;
>
> (3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and
>
> (4) the effect of the use upon the potential market for or value of the copyrighted work.

17 U.S.C. § 107.

"The factors enumerated in the section are not meant to be exclusive: '[S]ince the doctrine is an equitable rule of reason, no generally applicable definition is possible, and each case raising the question must be decided on its own facts.'" *Harper & Row*, 471 U.S. at 560, 105 S.Ct. 2218 (quoting House Report, at 65, U.S. Code Cong. & Admin. News 1976, p. 5678). At summary judgment, the Court is guided by the Ninth Circuit's instruction:

> "Fair use is a mixed question of law and fact." If there are no genuine issues of material fact, or if, even after resolving all issues in favor of the opposing party, a reasonable trier of fact can reach only one conclusion, a court may conclude as a matter of law whether the challenged use qualifies as a fair use of the copyrighted work.

*Hustler Magazine, Inc. v. Moral Majority, Inc.*, 796 F.2d 1148, 1150 (9th Cir.1986) (quoting *Harper & Row*, 471 U.S. at 559, 105 S.Ct. 2218; other citations omitted).

Accordingly, the Court addresses each of the statutory fair use factors separately here.

### A. *Purpose And Character Of The Use*

■ Analysis of the first of the four statutory factors comprises at least three separate considerations: the general purpose or character of the use, whether the use is "transformative," and whether the use is commercial in nature. 17 U.S.C. § 107(1) (articulating the first factor as "the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes").

### 1. Purpose Of The Use

The Court first considers whether Defendant's use of the Clip in *Jersey Boys* is the type of use that is likely to be considered fair. This aspect of the first of the four statutory factors speaks to the question of whether the character of the secondary-user's work is created to serve purposes of the type cited by the statute as legitimate goals of fair use. The list set out in the statute's preamble is not exhaustive and identifies "purposes *such as* criticism, comment, news reporting, teaching …, scholarship, or research" as illustrative of the types of uses for which fair use may provide an affirmative defense. 17 U.S.C. § 107 (emphasis added); *see also Harper & Row*, 471 U.S. at 561, 105 S.Ct. 2218 ("[W]hether a use referred to in the first sentence of section 107 is a fair use in a particular case will depend upon the application of the determinative factors, including those mentioned in the second sentence." (quoting S.Rep. No. 94–473, p. 62 (1975))).

Here, the Court is confronted with the fact that *Jersey Boys* does not fall clearly within any of the purposes specifically identified in the statute's preamble. However, Plaintiff characterizes *Jersey Boys* as

a fictionalized account of the Four Seasons' rise to fame, and Defendant characterizes the production as a dramatic work of biographical and cultural history. Either way, the parties at least are in agreement that *Jersey Boys* is "based on" the Four Seasons' career. The parties' arguments and evidence leave no doubt that the production is an entertaining dramatization that is based at least in part, if not predominantly, on actual events. *Cf. New Era Publications Intern., ApS v. Henry Holt and Co., Inc.,* 695 F.Supp. 1493, 1506 (S.D.N.Y.1988) (considering use of numerous quotations from the writings of L. Ron Hubbard, founder of the Church of Scientology, in a critical biography and explaining that, as to the first factor, "[t]here can be little doubt that this aspect of the fair use analysis generally favors an overall finding in favor of the biography").

At oral argument, Plaintiff urged the Court to distinguish between documentaries and dramatizations of historical events. Yet, Plaintiff identified no precedent clearly establishing that such a distinction is dispositive. *Cf. Hofheinz v. A & E Television Networks,* 146 F.Supp.2d 442, 446 (S.D.N.Y.2001) ("Defendants' [biographical film] 'Peter Graves: Mission Accomplished' may not be a 'scholarly' biography, but the use made of this particular footage . . . served to enrich the biography through the actor's perspective on his own work."). The fact that the Clip is used in a dramatization, as opposed to a scholarly recounting, of real events does not end the inquiry, and the Court does not purport to place a value on the extent to which *Jersey Boys* is "biographical." *Cf. New Era,* 695 F.Supp. at 1506 ("It is an uncomfortable role for courts to serve as literary critics, passing on whether a purported work of history, teaching or criticism is entitled to respect as such. We judges generally lack both competence and the necessary information to form such opinions."). There is no doubt, however, that *Jersey Boys is* a

dramatic production intended to entertain. For this reason, the Court finds that the "purpose of use" component of the first factor weighs in favor of Plaintiff and against a determination that Defendant's use of the Clip constitutes fair use. *See Stewart,* 495 U.S. at 237, 110 S.Ct. 1750 (agreeing that the use of a magazine story in a motion picture was not fair use and explaining that the motion picture did not represent the type of use protected by statute); *see also Public Affairs Associates, Inc. v. Rickover,* 268 F.Supp. 444, 450 (D.D.C.1967) ("The doctrine is usually applied in the case of scientific, legal, and historical materials, and also arises in connection with compilations, listings, and digests.").

### 2. Transformative Use

■ The more "transformative" the use of a copyrighted work, the more likely it is that the use will come within the protection of the fair use defense. As the Supreme Court explained:

The central purpose of this investigation is to see . . . whether the new work merely supersedes the objects of the original creation, or instead adds something new, with a further purpose or different character, altering the first with new expression, meaning, or message; it asks, in other words, whether and to what extent the new work is "transformative." Although such transformative use is not absolutely necessary for a finding of fair use, the goal of copyright, to promote science and the arts, is generally furthered by the creation of transformative works. Such works thus lie at the heart of the fair use doctrine's guarantee of breathing space within the confines of copyright, and the more transformative the new work, the less will be the significance of other factors, like commercialism, that may weigh against a finding of fair use.

*Campbell v. Acuff–Rose Music, Inc.,* 510 U.S. 569, 578–579, 114 S.Ct. 1164, 127 L.Ed.2d 500 (1994) (footnotes, internal quotations, alterations and citation omitted).

Here, Defendant's use of the Clip in the stage production of *Jersey Boys* is transformative. It is somewhat analogous to Court TV's use of a short excerpt of news footage of the beating of Reginald Denny in an "introductory montage for its show 'Prime Time Justice,'" which the Ninth Circuit found to have at least some claim to being a transformative use. *Los Angeles News Service v. CBS Broadcasting, Inc.,* 305 F.3d 924, 929–30, 939 (9th Cir. 2002) ("The development of the montage at least plausibly incorporates the element of creativity beyond mere republication, and it serves some purpose beyond newsworthiness."), *amended and superseded, Los Angeles News Service v. CBS Broadcasting, Inc.,* 313 F.3d 1093 (9th Cir.2002). Moreover, Defendant's use of the Clip in *Jersey Boys* is certainly more than a "mere re-broadcast" of a portion of the copyrighted episode of *The Ed Sullivan Show. Cf. Los Angeles News Service v. KCAL–TV Channel 9,* 108 F.3d 1119, 1122 (9th Cir.1997) ("Although KCAL apparently ran its own voice-over, it does not appear to have added anything new or transformative to what made the LANS work valuable—a clear, visual recording of the beating itself."). Plaintiff's assertion at oral argument that the use presently before the Court is more closely analogous to the use to which the video footage was put in *KCAL–TV* fails to recognize the fact that both parties in that case were "in the business of gathering and selling news" and thus the defendant's use of the video tape was not transformative. *Id.* at 1121–22 (explaining that "the tape was simply used as part of KCAL's coverage of the riots"). Moreover, *KCAL–TV* is not reasonably read to require a voice-over or other explicit "introduction" in order to render a use transformative. Even if such a requirement existed, however, the lines spoken by the actor in the role of Bob Gaudio serve to frame the transformative use to which the Clip is put in *Jersey Boys.* More specifically, Defendant's use of the Clip in *Jersey Boys* represents a transformative use because it is "cited as [a] historical reference point [ ]" in the Four Seasons' career, which use the Ninth Circuit has contrasted with uses that "serve [ ] the same intrinsic entertainment value that is protected" by the copyright in the copied work. *Elvis Presley Enterprises, Inc. v. Passport Video,* 349 F.3d 622, 629 (9th Cir.2003). As the Ninth Circuit explained:

It would be impossible to produce a biography of Elvis without showing some of his most famous television appearances for reference purposes. But some of the clips are played without much interruption, if any. The purpose of showing these clips likely goes beyond merely making a reference for a biography, but instead serves the same intrinsic entertainment value that is protected by Plaintiffs' copyrights.

We think Passport's use of significant portions of The Steve Allen Show is especially troubling. While showing a clip from these television shows is permissible to note their historical value, Passport crosses the line by making more than mere references to these events and instead shows significant portions of these copyrighted materials. . . .

Here, *Passport's use of many of the television clips is transformative because they are cited as historical reference points in the life of a remarkable entertainer.* The Definitive Elvis['] "nature as a biography transforms the purpose of showing these clips from pure entertainment to telling part of the story of Elvis" life. But many of the film clips

seem to be used in excess of this benign purpose, and instead are simply re-broadcast for entertainment purposes that Plaintiffs rightfully own.... *Id.* at 629 (emphasis added); *see also Hofheinz,* 146 F.Supp.2d at 446–47 (finding that inclusion of copyrighted film clips in biographical film about an actor constituted fair use because the biography "was not shown to recreate the creative expression reposing in plaintiff's [copyrighted] film, [but] for the transformative purpose of enabling the viewer to understand the actor's modest beginnings in the film business").

Accordingly, even considering the evidence in the light most favorable to Plaintiff, the Court finds that Defendant's use of a seven-second excerpt from the January 2, 1966 episode of *The Ed Sullivan Show* serves as a historical reference point in *Jersey Boys* and, as such, this aspect of the first factor weighs in favor of fair use. *See* Def's Sep. Stmt. at 4:20–5:6 (responding to Plaintiff's undisputed fact # 12, which states "[t]he clip is used at one of the key dramatic junctures of the show to illustrate that the Four Seasons have 'arrived,' i.e. have gone from relative obscurity to fame.").

### 3. Commercial Or Nonprofit Use

■ The analysis of the commercial nature of the secondary-user's work encompasses more than just whether the secondary use is a for-profit endeavor. "Although not controlling, the fact that a new use is commercial as opposed to non-profit weighs against a finding of fair use." *Elvis Presley,* 349 F.3d at 627 (citing *Harper & Row,* 471 U.S. at 562, 105 S.Ct. 2218). However, "the degree to which the new user exploits the copyright for commercial gain—as opposed to incidental use as part of a commercial enterprise—affects the weight we afford commercial nature as a factor." *Id.* "The crux of the profit/non-profit distinction is not whether the sole motive of the use is monetary gain but whether the user stands to profit from exploitation of the copyrighted material without paying the customary price." *Harper & Row,* 471 U.S. at 562, 105 S.Ct. 2218.

Here, the Clip is incorporated into a production that is properly characterized as a commercial endeavor, and Defendant profits, at least in some small part, from its use of the Clip without a license. However, at the same time, Defendant's use is transformative; Defendant screens only a short, seven-second segment of the entire January 2, 1966 episode of *The Ed Sullivan Show,* featuring only Ed Sullivan's brief introductory remarks rather than the Four Seasons themselves; and there is no evidence before the Court that Defendant used the Clip in the marketing of *Jersey Boys. See Elvis Presley,* 349 F.3d at 628 ("One of the most salient selling points on the box of *The Definitive Elvis* is that 'Every Film and Television Appearance is represented.' [Defendant] is not advertising a scholarly critique or historical analysis, but instead seeks to profit at least in part from the inherent entertainment value of Elvis' appearances on such shows as The Steve Allen Show, The Ed Sullivan Show, and The 1968 Comeback Special."). Thus, Defendant seeks to profit in very small measure by the inherent entertainment value of Ed Sullivan's introduction of the Four Seasons. Accordingly, to the extent Defendant's use of the Clip is commercial and, as such, weighs against fair use, this aspect of the first factor is not accorded great weight.

### B. *Nature Of The Copyrighted Work*

■ The second of the four statutory factors considers the nature of the plaintiff's copyrighted work. "The law generally recognizes a greater need to disseminate factual works than works of fiction or

fantasy." *Harper & Row*, 471 U.S. at 563, 105 S.Ct. 2218. "In other words, 'this factor calls for recognition that some works are closer to the core of intended copyright protection than others, with the consequence that fair use is more difficult to establish when the former works [i.e., factual works] are copied.'" *Elvis Presley*, 349 F.3d at 629 (quoting *Campbell*, 510 U.S. at 586, 114 S.Ct. 1164). Additionally, previously unpublished works are afforded greater protection; accordingly, an unauthorized use of a previously unpublished work is less likely to constitute a fair use. *Harper & Row*, 471 U.S. at 564, 105 S.Ct. 2218; *see also id.* at 550, 105 S.Ct. 2218 (noting that "the fair use doctrine was predicated on the author's implied consent to 'reasonable and customary' use when he released his work for public consumption").

As the Ninth Circuit noted in *Elvis Presley*, "television footage is a close call." 349 F.3d at 629–30 ("On the one hand, the appearances and concerts are creative in nature and thus fit into a category of work copyright is designed to protect. On the other hand, the footage is of such a significance that it can properly be characterized as 'newsworthy' events."). Additionally, the fact that *The Ed Sullivan Show* episode at issue here has already been broadcast weighs in Defendant's favor. *Id.* at 630; *see also Sony Corp. v. Universal City Studios, Inc.*, 464 U.S. 417, 454, 104 S.Ct. 774, 78 L.Ed.2d 574 (1984) (noting that interest in expanding public access to television broadcasting is factor to be considered in determining fair use). Accordingly, the second factor weighs at least slightly in favor of fair use.

## C. *Amount And Substantiality Of The Portion Used*

The third of the four statutory factors considers the "amount and substantiality" of the portion of the original copyrighted work used "in relation to the copyrighted work as a whole." 17 U.S.C. § 107(3). Here, Plaintiff does not argue that the Clip represents a substantial amount of the entire January 2, 1966 episode of *The Ed Sullivan Show*, rather, Plaintiff focuses on the "substantiality" of the Clip in relation to the episode as a whole. As the Ninth Circuit has explained:

> Regarding the qualitative nature of the work used, we look to see whether "the heart" of the copyrighted work is taken—in other words, whether the portion taken is the most likely to be newsworthy and important in licensing serialization. Finally, if the new user only copies as much as necessary for his or her intended use, this factor will not weigh against the new user.

*Elvis Presley*, 349 F.3d at 630 (concluding district court did not abuse its discretion in finding this factor weighed in plaintiffs' favor—and against a likelihood of success on fair use defense—because "[w]hile using a small number of clips to reference an event for biographical purposes seems fair, using a clip over and over will likely no longer serve a biographical purpose").

Here, Plaintiff argues that the seven-second clip is the "heart" of the work because Ed Sullivan's introduction of musical acts was the heart of the *The Ed Sullivan Show* episodes in which such acts performed. At oral argument, Plaintiff clarified its position that the Clip represents the entirety of Ed Sullivan's creative effort with respect to that portion of the show related to the Four Seasons' performance. Considering all the evidence in the light most favorable to Plaintiff, the Court cannot agree; and Plaintiff has identified no precedent to support a determination that a copyright owner's own subjective view of what constitutes the "heart" of a particular work in any given context is dispositive. At most, the introduction by Ed Sullivan can be said to be an

artery leading to the heart of the episode. Certainly, the actual performances by featured talent were, and are, the heart of *The Ed Sullivan Show* generally, and that is true of the episode on which the Four Seasons performed.

Finally, the Court notes that in analyzing the application of the third fair use factor, it is also appropriate to consider the secondary user's reason for using the portion of the copyrighted work. *See, e.g., Harper & Row,* 471 U.S. at 565, 105 S.Ct. 2218 ("As the statutory language indicates, a taking may not be excused merely because it is insubstantial with respect to the infringing work.... Conversely, the fact that a substantial portion of the infringing work was copied verbatim is evidence of the qualitative value of the copied material, both to the originator and to the plagiarist who seeks to profit from marketing someone else's copyrighted expression."). As discussed above, Defendant uses the Clip as a single, brief historical reference point in the context of a two-hour musical production. Even assuming, for the sake of argument, that Ed Sullivan's introduction of the Four Seasons' constituted the "heart" of the recording of the episode, the evidence before the Court does not support a determination that a reasonable jury could find that Defendant made that clip "the heart" of *Jersey Boys;* rather, the Clip is but a single historical reference point in the context of a far longer and more elaborate story arc. Accordingly, this factor weighs in favor of fair use.

### D. *Effect On The Market*

The fourth of the statutory factors considers "the effect of the use upon the potential market for or value of the copyrighted work." 17 U.S.C. § 107(4). This factor generally carries considerable weight in the determination of whether a secondary use constitutes a fair use. *Elvis Presley,* 349 F.3d at 630–31 ("The last, and 'undoubtedly the single most important' of all the factors, is the effect the use will have on the potential market for and value of the copyrighted works." (quoting *Harper & Row,* 471 U.S. at 566, 105 S.Ct. 2218)); *but see also Campbell,* 510 U.S. at 591 n. 21, 114 S.Ct. 1164 ("[T]he importance of this [fourth] factor will vary, not only with the amount of harm, but also with the relative strength of the showing on the other factors.") As the Supreme Court has explained, this fourth factor is concerned with protecting the original copyright holder's "incentive to create":

> The purpose of copyright is to create incentives for creative effort. Even copying for noncommercial purposes may impair the copyright holder's ability to obtain the rewards that Congress intended him to have. But a use that has no demonstrable effect upon the potential market for, or the value of, the copyrighted work need not be prohibited in order to protect the author's incentive to create.

*Sony,* 464 U.S. at 450, 104 S.Ct. 774; *see also American Geophysical Union v. Texaco Inc.,* 60 F.3d 913, 929 (2d Cir.1994) ("It is indisputable that, as a general matter, a copyright holder is entitled to demand a royalty for licensing others to use its copyrighted work, and that the impact on potential licensing revenues is a proper subject for consideration in assessing the fourth factor." (citations omitted)).

 Generally, the fourth factor is concerned with whether the unauthorized use competes for a share of the market for the original work. *See Harper & Row,* 471 U.S. at 568, 105 S.Ct. 2218 (quoting S.Rep. No. 94–473, p. 65 (1975), as follows: "With certain special exceptions ... a use that supplants any part of the normal market for a copyrighted work would ordinarily be considered an infringement"); *see also Bill Graham Archives v. Dorling Kindersley Ltd.,* 448 F.3d 605, 613 (2d Cir.2006) ("This

analysis requires a balancing of the benefit the public will derive if the use is permitted and the personal gain the copyright owner will receive if the use is denied." (internal quotations and citation omitted)). "The market for potential derivative uses includes only those that creators of original works would in general develop or license others to develop." *Campbell,* 510 U.S. at 592, 114 S.Ct. 1164; *see also Texaco,* 60 F.3d at 929–30 ("[N]ot every effect on potential licensing revenues enters the analysis under the fourth factor. Specifically, courts have recognized limits on the concept of potential licensing revenues by considering only traditional, reasonable, or likely to be developed markets when examining and assessing a secondary use's effect upon the potential market for or value of the copyrighted work." (internal quotations and citations omitted)). Additionally, "[t]he more transformative the new work, the less likely the new work's use of copyrighted materials will affect the market for the materials." *Elvis Presley,* 349 F.3d at 631.[5]

Here, the fact that Defendant's use of the copyrighted material is primarily for purposes of entertainment, which is not a use to which the fair use defense traditionally is extended, may contribute to this factor weighing against fair use. Additionally, to the extent that Defendant's use of the Clip is "commercial," as the term is used in the context of the first factor, the fourth factor weighs against fair use. As discussed above, however, Defendant incorporates the Clip into the context of a full-length stage show so that the marketability of *Jersey Boys* (its "commercial" aspect) cannot reasonably be said to be primarily dependent on Defendant's transformative use of the Clip. It follows that the extent to which Defendant stands to profit specifically from the use of the Clip itself is minimal.

Both moving for summary judgment and opposing Defendant's motion for summary judgment, Plaintiff has staked out the position that there are no factual issues in play and all the issues before the Court are questions of law. Plaintiff is not well served by this position in that Mr. Solt's declaration represents Plaintiff's *only* evidence in support of its argument that Defendant's use of the Clip has a deleterious effect on an existing or potential market for Plaintiff's copyrighted work. Solt

---

**5.** In *Elvis Presley,* the Ninth Circuit found that the district court did not clearly err in determining that the defendant's use of the plaintiffs' television clips, photographs, and musical recording likely affected the market for those copyrighted materials. The Circuit reached that conclusion on facts distinguishable from those before the Court in this case. As the Ninth Circuit explained:

> First, [Defendant]'s use is commercial in nature, and thus we can assume market harm. Second, [Defendant] has expressly advertised that *The Definitive Elvis* contains the television appearances for which Plaintiffs normally charge a licensing fee. If this type of use became widespread, it would likely undermine the market for selling Plaintiffs' copyrighted material. This conclusion, however, does not apply to the music and still photographs. It seems unlikely that someone in the market for these

materials would purchase *The Definitive Elvis* instead of a properly licensed product. Third, [Defendant]'s use of the television appearances was, in some instances, not transformative, and therefore these uses are likely to affect the market because they serve the same purpose as Plaintiffs' original works.

> We do not think this factor weighs strongly in either side's favor. But, for the reasons stated above that support the district court's decision, we cannot say that the district court abused its discretion in analyzing this factor. Furthermore, because we do not see any legal error or clear error in the district court's factual findings underlying any of the fair-use factors, we hold that the district court did not abuse its discretion in granting the preliminary injunction.

*Elvis Presley,* 349 F.3d at 631.

Decl. in Support of Pl's Mot ¶ 2 (attesting that Plaintiff "is in the business of licensing clips from its library of classic programming for use in film, television, and other media"); *id.* at ¶ 8 ("One of SOFA's significant sources of income is licensing fees generated from its copyright in 'The Ed Sullivan Show.' If third parties such as Defendant were able to reproduce, copy and/or display this copyrighted material, such as the Clip, for free, it would have a severe [e]ffect on SOFA's licensing market for 'The Ed Sullivan Show.' In fact, it would drastically reduce the value of SOFA's investment in the copyright[ed] work."). Plaintiff introduces no evidence demonstrating that it currently licenses (or plans to license) the Clip, and the Court agrees with Defendant that the notion that any such market could ever materialize is speculative at best. Even viewing statements in Solt's declaration in the light most favorable to Plaintiff, they are not sufficient to support a determination that a reasonable jury could view the evidence as sufficient to establish that the use of the Clip in *Jersey Boys* serves as a substitute for the original Clip. Additionally, to the extent that any existing or potential derivative market is, in fact, one for similarly transformative uses, this factor is less likely to weigh in Plaintiff's favor. In light of the lack of evidence of an existing or potential market for the Clip, this factor weighs in Defendant's favor.

### E. *Weighing Of The Factors*

█ No single factor or combination of factors controls the fair use analysis; rather, the Court must weigh all the facts "in light of the purposes of copyright." *Campbell v. Acuff–Rose Music, Inc.,* 510 U.S. 569, 577–78, 114 S.Ct. 1164, 127 L.Ed.2d 500 (1994) ("The task is not to be simplified with bright-line rules.... Nor may the four statutory factors be treated in isolation, one from another. All are to be explored, and the results weighed to-

gether, in light of the purposes of copyright."); *see also Twentieth Century,* 422 U.S. at 156, 95 S.Ct. 2040 ("Creative work is to be encouraged and rewarded, but private motivation must ultimately serve the cause of promoting broad public availability of literature, music, and the other arts.").

On the basis of the record before the Court, the "purpose of use" component of the first factor is the one element that weighs most heavily in favor of Plaintiff and against a determination that Defendant's use of the Clip constitutes fair use; Defendant's dramatization of some aspects of the Four Seasons' career does not fall clearly within any of the purposes specifically identified in the statute's preamble, *e.g.,* criticism, comment, news reporting, teaching, scholarship. *See* 17 U.S.C. § 107(4). Nevertheless, the Court is mindful that its inquiry does not end there. *Cf. Pacific and Southern Co., Inc. v. Duncan,* 744 F.2d 1490, 1495 (11th Cir.1984) (finding that district court erred in failing to consider the four statutory factors because the court determined that the use in question did not fall within statute's preamble). In sum, with respect to the remaining issues relevant to the analysis of the first statutory factor, Defendant's use of the Clip in *Jersey Boys* is decidedly transformative, and the weight accorded the "commercial" nature of Defendant's use is limited by the fact that the Clip represents only a very small part of the inherent entertainment value of the copyrighted work. As explained above, to the extent that Defendant's use of the Clip is commercial and, as such, weighs against fair use, this aspect of the first factor is not accorded great weight. The second factor, which is concerned with the nature of the copyrighted work, weighs at least slightly in favor of fair use because the television footage at issue does not strongly support or negate a determination that

the secondary use is a fair use and because *The Ed Sullivan Show* episode at issue here has already been broadcast. Additionally, neither the amount nor the substantiality of the copyrighted excerpt supports a determination that the third factor weighs in favor of Plaintiff and against a finding of fair use; the seven-second Clip cannot reasonably be said to constitute the heart of the January 2, 1966 episode of *The Ed Sullivan Show*. Finally, the evidence in the record does not provide a sufficient basis for a reasonable jury to find that an existing or potential market that Plaintiff can exploit is adversely affected by Defendant's transformative use of the Clip. Accordingly, the Court concludes as a matter of law that Defendant's use of the Clip qualifies as a fair use.

## V.

### *CONCLUSION*

In light of the foregoing:

1. Defendant Dodger Productions Inc.'s Motion for Summary Judgment is GRANTED; and

2. Plaintiff Sofa Entertainment, Inc.'s Motion for Partial Summary Judgment is DENIED.

Counsel for Defendant is directed to prepare and file a Judgment for the Court's signature within twenty (20) days of the date of this Order.

IT IS SO ORDERED.